Des Moines Bank & Trust Company, special administrator of estate of Lola G. Landes, deceased; Nancy Rousseau et al. on behalf of Iowa Southern Utilities Company, a corporation, and on behalf of themselves and other stockholders similarly situated, appellants, v. George M. Bechtel & Company, a copartnership, et al., appellees.

No. 47363.

(Reported in 51 N.W.2d 174)

1008

1009

1010

1012

JANUARY 8, 1952.

REHEARING DENIED JULY 28, 1952.

Havner & Powers, of Des Moines, F. A. Ontjes, of Mason City, and Hays, Guernsey & Powers, of Centerville, for appellants.

Cook, Blair & Balluff, of Davenport, for individual appellees.

Valentine & Valentine and Valentine & Greenleaf, all of Centerville, and Bradshaw, Fowler, Proctor & Fairgrave, of Des Moines, for Iowa Southern Utilities Company of Delaware, appellee.

Carl H. Lambach, of Davenport, for DeElda Lee, executrix of estate of J. Ross Lee, deceased, appellee.

BLISS, J.—By stipulation of the parties, approved by this court, the appeal was presented on a printed record of 550 pages of pleadings, procedural matters, and the findings, opinion and decree of the trial court of 148 pages. The evidence is not set out in the printed record. The printed arguments have over 600 pages. The evidence is before us, for review de novo, in 8000 or more pages of depositions and transcripts of testimony, and many thousands of exhibits accumulated in twenty or more years in the operation of this corporation, consisting of corporate records, books of account, minute books, correspondence, computations, and instruments and records of numerous kinds.

The original notices were served on the defendants on or about April 22, 1943, and the petition of plaintiffs, later amended, was filed May 7, 1943. Trial was begun before Judge Peisen on September 9, 1946, and continued to November 22, 1946, and terminated shortly thereafter by his death. Judge Narey was appointed as trial judge, and after reading the testimony already taken he proceeded with the trial on September 2, 1947, and concluded with the testimony on November 17, 1947, and rendered judgment and decree on May 25, 1948. The appeal was presented to this court at the April 1951 period.

One phase of the controversy was before this court on issues of law in State ex rel. Weede v. Iowa Southern Utilities Company of Delaware, 231 Iowa 784, 2 N.W.2d 372, 4 N.W.2d 869, and from a decree on a fact issue in said case (State ex rel. Weede v. Bechtel) in 239 Iowa 1298, 31 N.W.2d 853, 8 A. L. R.2d 1162.

The named plaintiffs herein are mostly persons living in the territory served by the Utilities company who bought their preferred stock from employees of the company or of others, all of whom were selling as agents of Bechtel & Company. To such as they and to the general public the preferred stock was sold at par and accrued dividends, particularly during the period when the major units of property were acquired. To the stockbrokers in New York City and elsewhere who had the selling rights out-. side of Iowa the Bechtel company delivered the preferred stock at discounts substantially under par.

Leona E. Tunnell and her sister, Alta M. Price, and William Randall acquired their stock in 1921 when the company was a

Maine corporation, and exchanged it for preferred stock in the Delaware company in 1924. The other named plaintiffs acquired their preferred stock in the Delaware company, for the most part, between 1924 and 1932, inclusive.

The petition, as amended, alleged, and the plaintiffs contend, that George M. Bechtel and Harold R. Bechtel, in conspiracy, co-operation and connivance with others of the defendants, fraudulently and wrongfully and in breach of their fiduciary relations to the Delaware company, in the acquisition of property for said company, secretly obtained it at prices greatly less than the prices at which it was turned into the company, and that the Bechtels and J. Ross Lee and other defendants wrongfully appropriated the excess consideration. Plaintiffs also alleged and contend that the Bechtels wrongfully took from the company large sums of money as operating or management fees in connection with the company, and approximately $700,000 in dividends on the common stock paid out of capital assets, and wrongful commissions and expenditures. Plaintiffs alleged and contend also that defendant Edward L. Shutts, E. F. Bulmahn and others, without the authority or knowledge of the directors, wrongfully appropriated by means of a secret account in the Harris Trust & Savings Bank of Chicago many thousands of dollars of the company's funds.

The individual defendants and the Iowa Southern Utilities Company of Delaware answered separately, and denied the allegations, and affirmatively pleaded that the recovery and relief prayed for were barred by statute of limitations and by laches, and as to certain defendants by discharges in bankruptcy, and that some issues are settled by prior adjudication.

No service was obtained on the defendants Edward de Rivera, H. H. Polk, and W. C. Langley & Co., and there are no appearances for them. After the commencement of this action, Martha R. Bechtel, the wife of George M. Bechtel, died, as did J. Ross Lee, and George M. Bechtel, as executor of the estate of Martha, and DeElda Lee, as executrix of the estate of her husband, were substituted respectively as defendants.

We will refer separately hereinafter to each specific item of wrongful conduct for which the plaintiffs seek recovery for the

company on behalf of themselves and of other stockholders similarly situated.

The numerous separate transactions involved in this appeal and the enormous record compel the court to limit the factual statement to a very inadequate presentation of the matters involved, in order to keep the opinion to a reasonable length. The controversy grows out of the very close and involved relations between the Iowa Southern Utilities Company and George M. Bechtel & Company. The latter was simply the name adopted by George M. Bechtel when he entered the business of buying and selling bond issues of the various municipalities of Iowa in 1891, with his main office at Davenport. The word "Bankers" followed the company name on his stationery, but he was not a banker in the commonly accepted or commercial sense of the word. In the earlier years he handled only municipal bonds, but when that business slackened he dealt also in other corporate bonds. It was claimed for him that he handled ninety per cent of the municipal bonds issued in Iowa. But he never accepted deposits except money of his customers left with him for bond purchases which was immediately redeposited to his credit in other regular banks. He never operated in the manner of the customary commercial or savings bank. Checks were not drawn upon him. He was not a member of the Davenport clearinghouse and he did not comply with statutory provisions or regulations applicable to banks.

When his son, Harold, finished school, and was later discharged from Army service, he began working for his father, and in January 1926 his father and he formed a partnership and retained the old business name of the father. After some years of apparently real success they met with reverses. On January 2, 1933, the Securities Department of the State of Iowa discovered that the Bechtels had neglected to renew their license to sell securities. Further investigation disclosed that the funds of various municipalities in their hands were not being kept segregated, but were mingled with their general deposits in other banks. A license was denied them and injunction and receivership proceedings were instituted, and in September 1933 involuntary bankruptcy proceedings were begun against the Bechtel partnership and its two partners, and carried to con-

clusion, and their discharge in 1934. Although the Bechtel company was a partnership G. M. Bechtel was designated as its president, Harold R. Bechtel signed the company name as vice-president, and J. Ross Lee, a very important factor in the company, was authorized to sign its name as vice-president.

Turning now to the affiliate of the Bechtel Company, the Utilities Company. It was incorporated in 1914 or 1915 as a Maine corporation under the name of the Iowa Southern Utilities Company of Maine, with its central office and its field of operation at Centerville, Iowa, and vicinity. G. M. Bechtel had some business connections with this company in its early years. He had also underwritten a bond issue for the municipal electric plant of the city of Newton, Iowa, on which the city defaulted, and turned the plant over to Bechtel for the balance of $32,500 owing on the bonds. He rebuilt the plant at an expense of $150,-000, and disposed of it to the David G. Fisher & Company, a dealer in public utility properties. This was Bechtel's entrance into that business.

On February 2, 1922, the Maine company, supra, bought the Newton plant from the Fisher company for $375,000. At a special meeting of the stockholders of the Maine company, at Portland, Maine, on February 20, 1922, all of the outstanding common stock of 5800 shares was present and held by David G. Fisher & Company, and of the preferred stock present the Fisher company held 1150 shares and Geo. M. Bechtel & Company held 1860 shares. At this meeting the capital was increased from $1,500,000 to $10,000,000, of 100,000 shares, 50,000 of which were preferred stock with a par value of $100 a share, and 50,000 shares were no-par value common stock. Among the six directors of the Maine company were Harold or H. R. Bechtel, Ray Nyemaster and Frank S. Payne. Each held one share of common stock to qualify him. Edward L. Shutts was assistant secretary. E. F. Bulmahn was also a director. At a meeting of the board of directors of the Maine company on January 19, 1923, J. Ross Lee was made a director and also a vice-president of said company. All of these persons were very active in the Centerville company in the years following.

On April 11, 1922, J. Ross Lee, acting for Geo. M. Bechtel & Co., made a written agreement, over his individual signature,

with J. C. Sullivan of the Creston Mutual Electric Light, Heat and Power Company of Creston, Iowa, to buy all of the common stock of that company, being 5000 shares, each of a par value of $10, for $300,000. The agreement was consummated and new directors and officers were promptly elected, with J. Ross Lee as president and H. R. Bechtel as a director and as secretary and treasurer. On January 23, 1923, Day & Zimmerman, nationally known engineers of Philadelphia with offices in New York City, Chicago and other large cities, transmitted to J. Ross Lee, in care of Geo. M. Bechtel & Co., the report of an audit and appraisal of the property of the Iowa Southern Utilities Company, and the property of the Creston company, supra. These engineers appraised the reproduction cost new less depreciation of the Creston property at $376,665.

Geo. M. Bechtel & Co. bought from David G. Fisher & Co. the 5800 outstanding shares of the common stock of the Maine company for $58,000, and also bought a part of its preferred stock for $137,000. Having control of the Maine company, and not being satisfied with some provisions of its articles, Geo. M. Bechtel effected its reorganization as a corporation of Delaware, under the name of the Iowa Southern Utilities Company of Delaware, and its Certificate of Incorporation was filed with the Secretary of the State of Delaware on February 12, 1923. It received permission to do business in Iowa by certificate issued on March 26, 1923. At the first meeting of the incorporators and subscribers to the stock of the new corporation at Wilmington, Delaware, on February 13, 1923, J. Ross Lee, H. R. Bechtel, David G. Fisher, Ray Nyemaster, E. F. Bulmahn and Frank S. Payne were elected as directors. At the first meeting of the board of directors, David G. Fisher was chosen president, with the understanding that he would comply with the instructions of Geo. M. Bechtel. Lee and Nyemaster were chosen vice-presidents, H. R. Bechtel, secretary, Shutts, assistant secretary, and Bulmahn as treasurer and general manager. The secretary and assistant secretary each took an oath and subscribed that he would faithfully, impartially and justly perform his official duties.

A special meeting of the board of directors of the Iowa Southern Utilities Company of Maine was held March 28, 1923,

at which the directors Lee, Bulmahn, Payne and H. R. Bechtel were present. It was unanimously resolved that the Maine company should sell and transfer all its property and assets of every kind to the Delaware company, subject to the lien of a mortgage dated October 2, 1916, given by the Maine company to the Central Trust Company of Illinois, as trustee, securing an issue of First-Mortgage Gold Bonds of the Maine company, of which $1,765,100 were outstanding, and subject also to the lien of a certain indenture of October 2, 1916, given by the Maine company to the First Trust Company, a Wisconsin corporation, as trustee, securing an issue of Serial Mortgage Debenture, 6% Gold Bonds, of which $260,000 were outstanding, all of which obligations the Delaware company assumed and agreed to pay. It was also resolved that the holders of the preferred stock of the Maine company would exchange it for a like amount of the preferred stock of the Delaware company, of the same par value, and that the 5800 shares of the common stock of the Maine company would be exchanged for the same number of shares of the common stock of the Delaware company, without nominal or par value.

The Certificate of Incorporation of the Iowa Southern Utilities Company of Delaware authorized the issuance of 100,000 shares of capital stock, of which 50,000 shares would be preferred stock with a par value of $100 a share, and 50,000 shares would be common stock without par value. The preferred stock was of three classes. One class entitled the holder to the payment of 7% Cumulative Dividends out of surplus or net profits, on the first days of January, April, July and October of each year. The term "cumulative dividends" meant, as the Articles provided, that if the dividends were not paid when due they would accumulate and be paid before any distribution of dividends could be made on the common stock. The other two classes of preferred stock were in every respect like the first except the dividend rates were 6½% and 6% per annum. The control of the corporation was in the common stock. The preferred stock had no voting power except that if default were made in the payment of the quarterly dividend on said preferred stock for four consecutive quarterly periods then the holders of the preferred stock would be entitled to elect a majority of the

directors until all accumulated and current dividends were paid.

Paragraph (f) of Article X of the Certificate of Incorporation of the Delaware company provided: "From time to time to determine whether and to what extent, at what time and place, and under what conditions and regulations the accounts and books of this corporation or any of them, shall be open to the inspection of any stockholders; and no stockholder shall have any right to inspect any account or book or document of this corporation except as conferred by statute or by the by-laws or as authorized by a resolution of the stockholders or Board of Directors."

Article XIII of the by-laws provided: "Inspection of Books. The directors shall determine from time to time whether, and, if allowed, when and under what conditions and regulations the accounts and books of the corporation (except such as may by statute be specifically open to inspection) or any of them, shall be open to the inspection of the stockholders, and the stockholders' rights in this respect are and shall be restricted and limited accordingly."

Section 5 of Article V of the by-laws provided: "The Board of Directors shall, except as otherwise provided by law, have power to act in the following manner: A resolution in writing, signed by all of the members of the Board of Directors shall be deemed to be action by such Board to the effect therein expressed, with the same force and effect as if the same had been duly passed by the same vote at a duly convened meeting, and it shall be the duty of the secretary of the company to record any such resolution in the minute book of the company, under its proper date."

Article XI of the Certificate of Incorporation of the Delaware company provided: "In the absence of fraud, no contract or transaction between the corporation and any other association or corporation shall be affected by the fact that any of the directors or officers of this corporation are interested in or are directors or officers of such other association or corporation, and any director or officer of this corporation individually may be a party to, or may be interested in any such contract or transaction of this corporation; and no such contract or transaction of this corporation with any person or persons, firm, association or corporation, shall be affected by the fact that any director or officer

of this corporation is a party to, or interested in such contract or transaction, or in any way connected with such person or persons, firm, association, or corporation, provided that such contract or other transaction shall be authorized or ratified by the vote of a sufficient number of the directors of this corporation not so interested; and each and every person who may become a director or officer of this corporation is hereby relieved from any liability that might otherwise exist from thus contracting with this corporation for the benefit of himself or any person, firm, association or corporation, in which he may be in any wise interested."

The purpose and significance of these provisions (charter and by-laws) become evident in the light of the subsequent operations and relations of the Bechtels with the Delaware corporation, of 'which they were the promoters, and thereafter directors and officers.

Division 1—Creston property.

On March 16, 1923, at the first meeting of the board of directors of the Iowa Southern Utilities Company of Delaware, which will hereinafter be referred to, generally, as the Company, at 211 Brady Street, Davenport, with all directors present, and David G. Fisher presiding, the chairman announced that Geo. M. Bechtel had proposed to sell and convey to the Company all of the property and assets of every kind of the Maine corporation, subject to the lien of the funded obligations of the Maine company above-noted ($1,765,100 and $260,000). And, in addition, to so sell and convey to the Company all of the property and assets of every kind of the Creston Mutual Electric Light, Heat & Power Co., the purchase of whose common stock had been negotiated by J. Ross Lee .in April 1922, and with Lee as president and a new set of officers and directors had been operated until the Delaware company could be organized and take over the Creston property.

The conditions and consideration of said offer and sale of said properties were: 1. Pay to or upon the order of Geo. M. Bechtel $802,500, as follows: $718,500 on April 2, 1923, and $12,000 on or before December 15 of each year from 1924 to 1930, inclusive, with interest at a mutually agreeable rate. 2. Issue to the holders of the $580,800, par value of the preferred

stock of the Maine corporation, a like amount, par value, of the preferred stock of the Delaware corporation. 3. To issue to or on the order of Geo. M. Bechtel 5800 shares of the common stock of the Delaware company, without nominal or par value, fully paid and nonassessable. 4. To assume, pay and discharge all of the bonds, debts and liabilities of the Maine company and of the Creston company. Upon a motion unanimously adopted it was resolved that: "WHEREAS, this corporation was organized for the purpose among others of acquiring said property, assets and effects referred to in said proposal", and since it was the judgment of the board of directors that the properties of the Maine company and of the Creston company, subject to the obligations, were of the values respectively of $3,750,000 and $750,000, the proposal was accepted.

The evidence establishes that Lee bought the common stock of the Creston company for Geo. M. Bechtel & Co. or Geo. M. Bechtel. The time for payment of the consideration was extended three times. According to the last extension agreement, of January 10, 1923, Lee was granted to April 1, 1923, to pay the balance of $60,000. On March 28, 1923, Lee, as president, and H. R. Bechtel, as secretary, of the Creston company, executed and acknowledged a deed conveying the real estate and buildings of that company to the Iowa Southern Utilities Company of Delaware for a recited consideration of $10 and other good and valuable consideration.

David G. Fisher & Company had contemplated buying the Creston property before he sold his stock in the Maine company to Bechtel. It was after Bechtel had acquired control of the Maine company that Lee secured the Creston stock. Fisher continued as president of the Maine company and also as president of the Delaware company until December 8, 1923, when his resignation of November 1, 1923 was accepted, and George M. Bechtel became his successor as president on December 8, 1923, and continued as such until February 20, 1933.

While Geo. M. Bechtel had a majority of the shares of the common stock of the Maine company when he purchased the Creston property, through J. Ross Lee in April 1922, he was not a director or officer of the Maine company. As a stockholder he had a right to purchase the Creston property at the lowest price

obtainable. He was buying it for himself and not for the Company. He bought it for $300,000. Day & Zimmerman appraised its value based upon its reproduction cost new less accrued depreciation at $376,665. On March 16, 1923, when Geo. M. Bechtel offered the Creston property to the Delaware company he was also not an officer nor a director of the Company, but he owned all of the controlling common stock. The president, Fisher, was under contract to do his bidding. His son, Harold, an employee of his father, was a director and secretary. He knew what the property cost his father and what Day & Zimmerman said its sound value was. J. Ross Lee, a director, had the same knowledge. The record amply sustains a finding that Bulmahn, Nyemaster and Payne were under the control and domination of Geo. M. Bechtel. When he compelled the board of directors to accept his proposal of $802,500, he was not dealing at arm's length with the Company, but he was cheating and defrauding the corporation in the amount of the difference between the Day & Zimmerman appraisal of $376,665, the fair valuation of a competent, disinterested appraiser, and the inflated price of Geo. M. Bechtel, or the sum of $425,835. We find the liability fixed by the trial court at $502,500 was $76,665 too much. There was no evidence of any improvements or additions to the property between the time of its purchase by Geo. M. Bechtel and its sale to the Company.

Division 2—Lamoni Electric Company.

The testimony by deposition of witnesses connected with the liquidation of this company shows that "the fixed assets of the company including its franchises and good will were sold to the Iowa Southern Utilities Co. as of June 1, 1925, for the sum of $150,000." The minutes of the board of directors of Iowa Southern Utilities Co. and other records show that Geo. M. Bechtel & Co., on July 9, 1925, sold the property of the Lamoni Electric Co. to the Utilities Co. for $250,000. H. R. Bechtel, as a witness in the Bechtel bankruptcy proceedings in 1934, testified that the books of Bechtel & Co. showed a profit of $100,673.50 on this transaction. The trial court found the unlawful profit in this transaction to the Bechtel Co. was $100,000, which agrees with our own conclusion. It is the amount claimed by the plaintiffs. At or about the time the Company authorized the payment of

$250,000 to Bechtel & Co., and on June 30, 1925, the latter company was owing the Utilities Co. $253,829.12.

### Division 3—Ottumwa property.

The Northern States Power Company owned the capital stock of the company or companies that had public utility plants and a traction system in and about Ottumwa. There is a bookkeeping controversy between the parties over some debit and credit entries on the books of the Iowa Southern Utilities Co. concerning current assets, and income and disbursements while the vendor was operating the business after the sale. Any confusion is clarified by other evidence. In the deposition of B. F. Braheney, vice-president and treasurer of the vendor, he stated that H. B. Byllesby & Co., an affiliate of the vendor, conducted the negotiations with Bechtel & Co. for its purchase. He was asked: "What was the amount, the price at which the properties were sold to George M. Bechtel & Co.?" He answered: "Well, the contract price for the sale of the physical properties was $3,000,000, which we received by check from the Guaranty Trust Company of New York on July 31, 1925. In addition, on February 28, 1926, we received an amount of $24,949 for the payment of the current assets. In the contract we sold them the physical properties with the adjustments to be made for net current assets. $24,949 was the payment for those net current assets." The general ledger of the vendor confirms this testimony. It appears that Edward L. Shutts, auditor of the Iowa Southern Utilities Co., on October 7, 1925, had written a letter to J. Ross Lee, copy of which is in the record, respecting these current assets. It had been sent to Mr. Braheney. Referring to the copy of the letter and its receipt, he testified that it "contains a statement of the net current assets for which George M. Bechtel & Company should pay to the Northern States Power Company System, in which he arrives at a figure of $24,949, and the accounting department of the Northern States Power Company rechecked the statement and agreed with the figure as outlined by Mr. Shutts, namely $24,949."

There is also in the record a photostat of "a copy of an outline of a contract of sale" over the signature of R. G. Hunt, a vice-president of the vendor, beginning thus:

"Chicago, May 26, 1925.

"To All Concerned: Sale of Ottumwa Properties.

We have contracted to sell to George M. Bechtel & Company of Davenport, Iowa, the physical properties of the Ottumwa Traction Company and Northern States Power Company of New Jersey, located in Wapello and Jefferson Counties, Iowa, together with all franchises, licenses, easements, and other rights, for the sum of $3,000,000, payable on or before the following dates:

| | |
|---|---|
| Cash down—paid | $ 25,000 |
| June 1st | 75,000 |
| June 15th | 150,000 |
| September 1st | 2,750,000 with interest |

on all deferred payments at the rate of 6% per annum from June 1, 1925. In addition the Purchaser to pay for all cash on hand, materials and supplies on hand, fuel on hand and unexpired insurance premiums as determined as of June 1, 1925 * * *."

Further confirmation is found in the letter of J. Ross Lee of July 30, 1925 to Mr. Shutts, stating:

"On yesterday, Bechtel & Co. delivered to Iowa Southern Utilities Co. the Ottumwa properties for a consideration of $3,250,000. This consideration includes all of the physical properties, together with all current assets and cash in the bank. We have paid Byllesby & Co. for everything aside from the current assets and this is to be settled as soon as you can check same and agree upon figures * * *."

The principal amount which Bechtel & Co. paid for the Ottumwa property was therefore $3,000,000 plus $24,949 or $3,024,949. Mr. Braheney testified that his company sold the property because they thought the purchase price was its "full fair value."

At the same meeting of the board of directors of the Company, on July 9, 1925, at which the purchase of the Lamoni property was authorized, the offer of Bechtel & Co. to sell all of the Ottumwa property of the Northern States Power Co. for $3,250,000 was accepted.

In the suit in the Federal District Court for the Southern

District of Iowa brought by Smith Blackman, trustee in the Bechtel bankruptcy, v. Martha R. Bechtel et al., in 1934, 80 F.2d 505, to recover the common stock of the Iowa Southern as a part of the bankrupts' estate, H. R. Bechtel was a witness for defendants. A transcript of his testimony shows that he said the books of Bechtel & Co. reflected a profit on the Ottumwa transaction of $161,383.26. These books and records are said to have been lost or destroyed. They were not available in this trial. H. R. Bechtel was a witness for the defendants in this trial. The trial court accepted his testimony that the Ottumwa profit was $161,383.26. We think the worthier evidence is that the profit to Bechtel & Co. was $225,051.

At the same meeting of the board on July 9, 1925, it authorized the issuance of $3,210,900, First and Refunding Mortgage Gold Bonds of the Series of 1925, bearing annual interest of 5½% payable semiannually, and J. Ross Lee was directed to sell not exceeding $3,100,000 par value of the bonds to Hoagland, Allum & Company at a price not less than 91¼.

Geo. M. Bechtel presided at this board meeting and H. R. Bechtel was the secretary. The remaining members of the board present were Lee, Payne, Nyemaster and Bulmahn.

The proceeds of the sale of these bonds provided for the payment of the $3,000,000 check on July 31, 1925 to the Northern States Power Co. In Account No. 75, being the Geo. M. Bechtel & Co. Bankers Account, in the general ledger of the Iowa Southern Utilities Co. in July and August 1925 are the following entries: The one credit of $3,249,137.06, and the following debits: $150,000, $97,472.22 and $2,750,333.33 for a total of $2,997,805.55. On August 5, 1925 is an entry in this account of $251,331.51, with this explanation: "recording sale of Twenty-five Hundred shares of preferred stock of this company at par and accrued dividends ($1,331.51) from July 1, proceeds deposited with George M. Bechtel and Company, Bankers." The total of debits and credits is $3,249,137.06, and the difference between that sum and the $3,250,000 is made up by a check for $862.94 (Exhibit D635). It fairly appears from this record that Geo. M. Bechtel & Co. bought the Ottumwa property with funds provided by the Iowa Southern Utilities Co. and then sold it to said Company at a profit of $225,051 to Geo. M. Bechtel & Co.

Article XI of the Certificate of Incorporation, supra, does not give absolution to this transaction, with three directors of the board of six—the two Bechtels and Lee—financially interested, and handling the transaction as officers and fiduciary agents of Iowa Southern Utilities Co. J. Ross Lee was the business manager of Geo. M. Bechtel & Co., drawing a large salary and otherwise financially interested. This appears from the testimony of H. R. Bechtel, and by a letter which Lee wrote to W. C. Langley & Co. on March 10, 1924, explaining that Bechtel & Co. was not a corporation but was a partnership, and stating: "Several of us work on a salary basis, together with a percentage of the profits."

Division 4—Burlington Railway & Light Company.

On July 24, 1924, the American Utilities Corporation, by M. A. Walsh, its president, made a written offer to Geo. M. Bechtel & Co. to sell to the latter one of its properties, known as the Burlington Railway & Light Co. The property sold was the street railway system in Burlington and West Burlington including all equipment, carbarn and power plant, the gas properties in Burlington operated by the Peoples Gas & Electric Co., including real estate and the steam heating plant, and the electric light systems in Burlington and West Burlington and in fifteen other cities and towns. The offer was accepted by J. Ross Lee as vice-president of the Bechtel company, with a down payment of $25,000 and $75,000 on July 25, 1924. Under the contract deferred payments of $100,000 each were to be made on the first of October, November and December 1924, and the balance of the purchase price before January 1, 1925. The full consideration was such an amount as would equal five times the gross earnings of the property bought, including light, power and railway receipts etc., for the twelve months just preceding August 1, 1924. The purchaser was to assume a mortgage indebtedness of $1,678,000 to be deducted from the purchase price, and some taxes and assessments.

Correspondence and other matters indicate that W. C. Langley & Co. desired the purchase to be consummated. An inducing reason for that desire might well have been the agreement of Bechtel & Co. and Langley & Co., made on January 25, 1924, and inquired into in the examination of H. R. Bechtel (Vol. VI

of second transcript, page 3429 et seq.). This agreement pertains to the offer by Bechtel & Co. of cumulative preferred stock of the Iowa Southern Utilities Co. to the Langley Co. It is Exhibit 170T. It is stated in paragraph 1 thereof that the price of the stock to Langley & Co. is to be 78 and accrued dividends to the date of each delivery that shall be made of any part of said stock. "In the event, however, that we (Langley & Co.) offer to the public said stock at a higher price than 90 and accrued dividends you (Bechtel & Co.) shall receive the difference between 90 and such price." This agreement was very apparently prepared by Langley & Co., as certain restrictions respecting the issuance and offer of the preferred stock were favorable to Langley & Co. and unfavorable to the Iowa Southern Utilities Co.

The minutes of a meeting of the board of directors of the Iowa Southern Utilities Company, of February 15, 1924, which approved the agreement and stated several paragraphs of it, omitted paragraph 1, set out above, of the agreement. H. R. Bechtel, who as secretary wrote and signed the minutes, said he could not explain the omission. The directors who are noted as being present were Geo. M. Bechtel, E. F. Bulmahn, H. R. Bechtel, J. Ross Lee and Ray Nyemaster. The minutes were signed by Geo. M. Bechtel, President, H. R.Bechtel, Secretary, Frank S. Payne, E. F. Bulmahn and Ray Nyemaster. H. R. Bechtel was unable to say whether the minutes were written up by someone and passed around for the directors to sign, or whether the board actually met.

The minutes, contrary to the agreement, stated that Langley & Co. agreed to pay 100 and accrued dividends to the Iowa Southern Utilities Co.

The record indicates that Bechtel & Co. contracted for the property, not for itself, but for the ISU (Iowa Southern Utilities Co.) or used its securities to pay the vendor. A letter of July 30, 1924, to "E. F. Bulmahn, Gen. Mgr." of ISU, stated: "Mr. Symonds told me confidentially that you were interested in the Burlington property." And on July 26, 1924, J. Ross Lee sent a special delivery letter to Mr. Bulmahn, stating: "We are hastening to inclose you herewith a copy of the agreement entered into yesterday between Geo. M. Bechtel & Co. and the American Utilities Corporation for the purchase of the Burling-

ton System." And on the same day, July 26, 1924, Mr. Lee sent another letter by special delivery to Mr. Bulmahn, giving the gross earnings for the Burlington Railway for the twelve months ending December 31, 1923. On August 18, 1924, Mr. Bulmahn, as general manager of ISU, wrote to the Mississippi River Power Co. at Keokuk about the purchase of electric current.

On September 4, 1924, the ISU by Geo. M. Bechtel, its president, made an agreement with the American Utilities Corporation and its affiliate, United Utilities Co., supplemental to the contract of July 24, 1924, that it would assume the obligations of Geo. M. Bechtel & Co. in the latter contract. And in a memorandum to the agreement of September 4, 1924, and on that date, Geo. M. Bechtel agreed that it or he was in no way released from the provisions of the contract of July 24, 1924.

In the second special delivery letter of July 26, 1924, of Mr. Lee to Mr. Bulmahn, supra, it is stated: "The writer has been trying to get Mr. W. C. Langley of New York on the phone, but so far has been unsuccessful, and may decide under the conditions to leave tomorrow for New York for a conference. If I make such trip, I will go on the Century and only be in New York a few hours. I will keep you fully posted * * *."

The minute book of ISU shows minutes of a special meeting of the board as of September 2, 1924, at which Geo. M. Bechtel presided, H. R. Bechtel was the secretary, and Frank S. Payne, E. F. Bulmahn and J. Ross Lee were present, as additional directors. All five signed the minutes. Three of them were financially interested in 'the resolution adopted, which accepted the proposal that Geo. M. Bechtel had offered to sell the Burlington properties to ISU subject to the assumed mortgage lien of $1,678,-000. In consideration of said sale ISU agreed: 1. To pay to Geo. M. Bechtel $970,000. 2. To issue to Geo. M. Bechtel $1,000,-000 par value of preferred stock of ISU fully paid and nonassessable, to be delivered as follows: $950,000 when title to the property was passed, and the remaining $50,000 on or before February 1, 1925, or Geo. M. Bechtel might accept, instead of the remaining 500 shares, the sum of $50,000 in cash. 3. ISU to deliver to said Bechtel 4200 shares of the common stock of ISU at a value of $420,000. 4. Certain other obligations were assumed by ISU.

The minutes did not mention the consideration which Bechtel & Co. had agreed to pay in the contract of July 24, 1924. The vendor employed W. A. Leopold of Homewood, Illinois, an expert public utilities accountant to ascertain what the gross earnings of the Burlington properties were for the year preceding August 1, 1924. He testified that Mr. Shutts, the auditor of ISU, came to Burlington to ascertain the earnings while he (Leopold) was working on the books, and that he showed and explained his calculations to Mr. Shutts. As a witness Mr. Shutts denied this testimony of Mr. Leopold. The record shows that it was stipulated on December 27, 1924, that the gross earnings for said year, multiplied by five, were $3,570,000.

The record also shows that Mr. Lee sent to Langley & Co. a copy of the contract of July 24, 1924, and also an appraisement of Day & Zimmerman of the Burlington property made in July 1924, bearing date of September 24, 1924, and that the minutes of the board meeting of ISU as of September 2, 1924, were first sent to Langley & Co. for approval before being entered in the minute book.

The details of the transaction and the exchange of the stock and the checks were all effected by a joint long-distance telephone conference on December 27, 1924, between New York City and Burlington, participated in by Langley & Co. and their lawyers, Seibert & Riggs, the American Exchange National Bank which held the preferred stock, and its lawyer, Harold Gallagher, all at New York, with the Walshes, and Mr. Waterman of the law firm of Lane & Waterman of Davenport, and Mr. Lee of Bechtel & Co., in the county recorder's office at Burlington. Letters showing the arranging of the conference and of its subsequent consummation are all in the record. Langley & Co. was given 9500 shares of the 7% preferred stock of ISU which it took at the price of 80 and the accrued dividends. In return it delivered its check for $757,500 payable to Geo. M. Betchel & Co., its check to the American Exchange National Bank for $2500, balance of purchase price of the 9500 shares out of which the bank was to pay stamp charges etc., and its check to the same bank for $16,440.32, representing accrued dividends on the 9500 shares of stock from October 1 to December 30, 1924. The total of those three checks is $776,440.32, which sum deducted from $950,000, the face of the bonds, left as the amount of the discount to

Langley & Co. the sum of $173,559.68. If it sold these bonds to its customers at par that sum would be its gross profit, to be decreased if sales were made under par.

The entries in the Geo. M. Betchel & Co. Vendors Account on the books of ISU, of the Burlington transaction, on the credit side are $2,440,976.97 and interest paid of $27,966.66 for a total of $2,468,943.63, which is balanced by debit items, but these do not reflect the discount in the sale of the bonds. The plaintiffs assert that Bechtel & Co. made an unlawful profit of $548,976.97 in the transaction, and they contend that the property was over valued.

The trial court found that according to the appraisal of the Executive Council of Iowa and that of Day & Zimmerman, both of which were over $4,000,000, the property was not over valued, and fixed the profit derived by Betchel & Co. at $501,676.97.

It is our conclusion that Bechtel & Co. received the following: $1,000,000 6% Gold Notes of ISU at 97, or $970,000. It accepted the $50,000 in cash instead of the 500 shares of 7% preferred stock. It received 4200 shares of ISU common stock at a valuation of $420,000. It received $757,500 from Langley & Co. for the 9500 shares of 7% preferred stock delivered to them at approximately 80 and accrued dividends. The sum of those four items was $2,197,500. W. A. Leopold, who was hired by the Walshes to ascertain the amount they were entitled to under their contract with Bechtel & Co., assumed by ISU, testified that, after deducting from the contract sale price of $3,570,000 the bonded indebtedness of $1,678,000 and other assumed obligations, the total amount owing the vendors was $1,833,666.21. Deducting this amount from $2,197,500 received by Bechtel & Co. leaves $363,833.79 as the wrongful profit taken by the Bechtels.

Aside from this sum taken from ISU the transaction caused greater losses to it. This should have been apparent when the resolution of September 2, 1924 was adopted by a Bechtel controlled board of directors. It was recognized then that a power plant valued at approximately $670,000 was of little value. It was at once abandoned. The street railway property was obsolescent and was abandoned within three or four years at a loss of over $2,000,000. The bonded debt which was assumed, and matured in 1932, was twice extended with the interest rate in-

creased from 5% to 8%, with added expense and commissions to Langley & Co. and to others, in substantial amounts, for procuring the extensions. There was expert opinion testimony that when this property was sold in 1924 the street railway property was worth only junk, or salvage value.

Division 5—Albia Light & Railway Company.

George M. Bechtel acquired all of the common stock—4000 shares—and 8004 shares of the 10,000 shares of its preferred stock between April 7 and October 19, 1922. It was operated as a separate entity, but as a subsidiary or affiliate of ISU. In 1923 its office and its management were transferred to ISU, but there was no change in its ownership. It had its own directors and officers. On March 24, 1924, according to a letter of Geo. M. Bechtel to Mr. Bulmahn its officers were J. Ross Lee, president, E. F. Bulmahn, vice-president, H. R. Bechtel, secretary and treasurer, all of whom with Geo. M. Bechtel and Frank S. Payne were directors. The par value of the common stock was $100, and the par value of the preferred stock was $10, a share.

For the years 1923 to 1928, inclusive, this company lost money each year, except in 1925 when the profit was $978.85. During these years its total operating losses were $158,489.16. On December 3, 1928, Geo. M. Bechtel wrote Mr. Bulmahn that it would be agreeable to him to put the Albia company into ISU. On December 6, 1928, Mr. Bulmahn replied: "We will proceed in the office in line with this conclusion. * * * I believe it would be best to have the necessary papers covering this transfer drawn up in Davenport *to avoid a lot of discussion here.*" (Italics ours.)

The board of directors of ISU held a special meeting on January 3, 1929. Geo. M. Bechtel, as president, presided. H. R. Bechtel was secretary, and Mr. Bulmahn, Mr. Payne, Mr. Nyemaster and Mr. Lee, the remainder of the board, were present. All except Mr. Nyemaster were also officers of the Albia company. Geo. M. Bechtel, H. R. Bechtel, E. F. Bulmahn and Lee had a financial interest in the transaction. It was definitely a Bechtel board. The chairman, Geo. M. Bechtel, stated that Geo. M. Bechtel proposed to sell and transfer to ISU the following items of property:

1. All the capital stock of the Albia Light & Railway Co. consisting of 10,000 shares of its preferred stock having a par

value of $10 a share, 4000 shares of its common stock having a par value of $100 a share, for a consideration of $295,500.

2. A judgment entered in the Monroe District Court on February 13, 1922, in favor of the Gold Goose Coal & Mining Co. against the Albia Light & Railway Co., for a consideration of $5052.64.

3. A tax-sale certificate of the Monroe County treasurer against the property of the Albia Light & Railway Co. dated December 2, 1918, for a consideration of $5749.52.

4. An open account due Geo. M. Bechtel by the Albia Light & Railway Co. "at the face value thereof as the same exists on March 12, 1929."

The board unanimously adopted a preamble and resolution that it was for the best interests of the Company to accept the offer, as in the opinion of the board each of the four items were worth at least the respective amounts asked, and the treasurer was authorized to pay to Geo. M. Bechtel the sum of $306,302.16 on or before March 12, 1929, and an "additional sum as may be due" on the open account.

At the same meeting the chairman stated that Geo. M. Bechtel had proposed to sell to ISU all of the First-Mortgage 5% Sinking Fund Gold Bonds of the Albia L. & Ry. Co. that he may own or deliver on and after November 1, 1929, in consideration of the payment to Geo. M. Bechtel of the face value of said bonds together with accrued interest. The board unanimously accepted said offer and authorized payment of the consideration, as proposed, by a resolution worded substantially the same as the one previously adopted.

The record shows that item 4 of the first resolution was an open account of $29,500 owing Geo. M. Bechtel by the Albia L. & Ry. Co. This appears from the fact that the Geo. M. Bechtel & Co. Bankers Account was credited with $335,802.16 on March 12, 1929, which amount included the $306,302.16, being the total consideration of items 1, 2 and 3 of the first resolution of the board, and the open account of $29,500. This open account was apparently transformed later into four promissory notes of the Albia company in a total amount of $31,500 on which there was paid $11,500, leaving the note indebtedness in the amount of $20,000.

The record also shows that ISU purchased First-Mortgage

5% Sinking Fund Gold Bonds of the Albia L. & Ry. Co. at the agreed face value of $140,000.

In November 1935 the Articles of Incorporation of the Albia L. & Ry. Co. were amended to reduce the 4000 shares of common stock to 500 shares of new common stock, which were sold to H. D. Mabry for $500. The preferred stock was reduced from 10,000 shares to 4500 shares of new preferred stock.

After the purchase of the stock of the Albia L. & Ry. Co. by ISU and during the period the latter operated the Albia company from 1929 to October 31, 1941, inclusive, there was a net loss each year and the total losses for that period were $114,247.73, making the total operating losses from 1923 to October 31, 1941, inclusive, $272,736.89. No dividends were ever paid.

As the operating losses piled up year after year it was plainly evident that whatever value the stock, bonds and notes of the Albia company had was rapidly decreasing, and substantial periodic allowances were made for the depreciation and retirement reserve on these assets. These securities appeared on the ISU books as follows:

| | | |
|---|---|---|
| Preferred stock | $163,202.28 | |
| First mortgage bonds | 140,000.00 | |
| Promissory notes | 20,000.00 | |
| Accrued interest on bonds | 2,702.78 | |
| Accrued interest on notes | 463.33 | $326,368.39 |
| | | |
| Less: Reserve for losses on Albia securities | $263,202.28 | |
| Reserve for unearned interest | 9,908.33 | $273,110.61 |
| | | |
| Net carrying value as of May 19, 1941. | | $ 53,257.78 |

On May 3, 1941, a contract was made by ISU to sell these assets to Quail & Company as follows:

1. $140,000 of First-Mortgage bonds for 35% of the face value $49,000
2. $20,000 of promissory notes 4,000
3. 4500 shares of 7% preferred stock, par value $100 each 7,000

 Total $60,000

The loss sustained by ISU on these purchases from Geo. M. Bechtel was $288,000 on the capital stock, $16,000 on the notes and $91,000 on the bonds, for a total loss of $395,000. This was not an instance where Geo. M. Bechtel was buying property for ISU or using its money to buy property to resell to it. There is no evidence to establish either. He had bought this property and owned it for seven years and there is no reasonable doubt that he knew it had little value and little prospect of increasing in value. The language of Judge Narey aptly and correctly states the facts:

"In view of the history of the financial worth or value of the Albia utility over the years there would seem to be no justification whatever for the purchase of that utility by the Iowa Southern Utilities Company. The Albia plant was a losing proposition as an independent utility and continued to be a losing proposition financially as a unit of the Iowa Southern Utilities Company. * * * If the transfer * * * was in fact a sale then it emphatically demonstrates Bechtel's domination of all the affairs of the Company, and would seem to the trial court to be nothing more than unloading a liability on the Iowa Southern Utilities Company for the personal advantage and benefit of Bechtel.

"In the opinion of the court there just is not any reason shown in the record justifying the Albia transaction so far as the Iowa Southern Utilities Company is concerned, and it is but another emphatic illustration of the avarice prevailing in all of the different transactions."

It is not surprising that Mr. Bulmahn asked Geo. M. Bechtel to have the papers of the Albia transfer of property drawn at Davenport rather than at Centerville. It was publicity of a matter which the home folks would not like.

The able trial court based his finding of the loss sustained on the testimony of H. R. Bechtel that the books of the Bechtel company showed its net profit on the transaction as of December 31, 1929, at $226,327.25. We think it is the wrong measure in this instance. It is the loss suffered by ISU rather than the benefit to Geo. M. Bechtel & Co. that is the true criterion. In violation of a duty and a fiduciary relation to ISU he had a compliant board of directors do his bidding in dumping prop-

erty of little worth, for a sound price, upon a company whose assets he should have protected instead of plundered. The other members of the board participated in his wrongdoing. The loss of $395,000 falls far short of measuring the damages suffered by the Company.

Division 6—Burlington Gas Light Company.

At a special meeting of the board of directors of ISU on July 1, 1926, with Geo. M. Bechtel presiding, H. R. Bechtel as secretary, the remaining directors, Bulmahn, Payne and Lee present, and Nyemaster absent, the chairman stated that Geo. M. Bechtel & Co. had proposed to sell to ISU the real estate and all personal property and assets of every kind of the Burlington Gas Light Co. in consideration of the payment of $1,250,000, in cash to the vendor. A resolution was unanimously adopted accepting the offer. Another resolution was then promptly adopted with unanimity, authorizing the issuance of $1,000,000 of First and Refunding Gold Bonds of the Series of 1925, with directions to J. Ross Lee to sell the entire issue to Geo. M. Bechtel & Co. at a price not less than 90 and accrued interest. Geo. M. Bechtel & Co. was clearly using the funds of ISU to finance the purchase of this property and sale of it at an unlawful profit to Bechtel & Co. Four of the five members voting for the resolutions were financially interested in the illegal profits. H. R. Bechtel, a member of the Bechtel partnership, as a witness in the suit by the trustee of the Bechtel bankrupt estate in 1934 testified that Geo. M. Bechtel & Co. made a profit in the transaction of $118,-868.14. The trial court accepted the testimony of H. R. Bechtel on this issue and found the fraudulent profit to have been $118,-868.14. We agree with this finding. We note here that during the years 1928, 1929, 1930, 1931 and 1932 there were no annual meetings of the stockholders of ISU and no annual election of officers. The officers and directors simply held over from year to year. The Bechtels placed three qualifying shares of common stock in the name of each of the other directors, but retained ownership of the shares and took the dividends thereon.

Division 7—Town of Murray property.

The board of directors of ISU at a special meeting on August 27, 1929, with Geo. M. Bechtel as president and H. R. Bechtel as secretary, and the other directors Lee, Nyemaster, Payne and

Bulmahn present, by resolution directed the authorized officers of the Company to purchase of Geo. M. Bechtel & Co. the electric distribution system of said town for $22,000. The testimony of H. R. Bechtel in the bankruptcy trial, hereinbefore referred to, that the profit to Bechtel & Co. in the transaction was $2000, was read into the record and was undenied. We find that said profit was an unlawful taking of property of ISU. Such also was the finding of the trial court.

Division 8—Peoples Light & Fuel Company of Grinnell.

On January 6, 1928, at a special meeting of the board of directors at which both Bechtels and Bulmahn, Lee and Payne were present, Geo. M. Bechtel proposed to sell to ISU the real estate and all other property of the utility company noted above, for a payment to him of $201,388.96, in cash during May 1928. The offer was, by resolution, promptly and unanimously accepted and the officers were directed to take the needed steps to effect the sale. On May 5, 1928, the board met at a special meeting, with the same officers and directors present, and authorized the issue of 1000 shares of 6½% preferred stock and also an issue of 1000 shares of 6% preferred stock. J. Ross Lee was directed to sell these issues. The records show the issue of this stock as of May 10, 1928, for a total of $201,388.89, and that on May 21, 1928, the 6% issue was broken into ten 100-share certificates issued to Geo. M. Bechtel. A like reissue was made of the 6½% issue. The stock ledgers show the transfer of stock certificates of these reissues to the Peoples Light & Fuel Company and to persons connected with it, including E. B. Brande. The 260 shares issued to him were later reissued to his son, Dawson Brande, who thereafter became a director of ISU. He was the treasurer of the Peoples Light & Fuel Company in 1919.

Geo. M. Bechtel transferred the property of this Grinnell utility company to ISU on May 31, 1928. The books of ISU show a credit entry of $201,388.96 in the account of Geo. M. Bechtel & Co., Bankers, and the payment of the voucher therefor out of funds of ISU on deposit with Geo. M. Bechtel & Co.

There is no direct evidence of what this Grinnell utility property cost the Bechtels. But Exhibit 42, being ledger sheets of Geo. M. Bechtel & Co. from which H. R. Bechtel testified in the bankruptcy trial, showed a profit on this Grinnell transaction,

according to his testimony, of $121,268.85. There is no evidence to the contrary and we accept it, as did the trial court, as a correct statement. The record establishes that the purchase of the property by Bechtel & Co. was effected by preferred stock issued by ISU.

Division 9—Iowa Light, Heat & Power Company of Grinnell.

At a special meeting of the board of directors of ISU on January 15, 1926, with Geo. M. Bechtel presiding, H. R. Bechtel, as secretary, and the other directors, Bulmahn, Payne and Lee present, the latter stated that in February 1924 Geo. M. Bechtel & Co. entered into an arrangement to acquire on its own account the plant and distribution systems of the company above-named in Jasper and Poweshiek Counties at a price of $712,500, plus the cost of improvements made to the plant from then until August 1, 1924; that in June 1924 arrangements were made for the sale of the plant to the Bechtel company in accord with the earlier negotiations, but since a release of the property from the lien of a trust deed could not be secured, a combined lease and sale contract was entered into, under which Geo. M. Bechtel & Co. took possession of the property and made improvements thereon to the extent of $37,500. The chairman then stated that Geo. M. Bechtel was offering this property, as so improved, to ISU for $750,000 in cash.

With its customary preamble that it thought the purchase was for the best interests of the corporation and that the value of the property was "at least" $750,000, "based upon the personal knowledge of the various members of this board, and from the investigations made by them", a resolution was adopted, without dissent, to accept the offer and to consummate the purchase. Immediately, and with the same unanimity, another resolution was adopted, stating: "WHEREAS THIS CORPORATION has actually expended for such property and equipment the sum of $750,000 which amount is the actual cost thereof to this corporation, and * * *. WHEREAS the Company is entitled to have certified and issued bonds * * * to the amount of eighty per cent of said actual cost * * *. Now THEREFORE be it resolved * * *" that this Company issue $600,000 of 5½% Gold Bonds. Another resolution provided for the issuance of other bonds in the amount of $127,200. Both bond issues were for delivery to J. Ross Lee and on

his order. At the next meeting in February 1926, 6% Gold notes for $300,000 payable serially at the office of Geo. M. Bechtel & Co. were ordered delivered to said Company at a price of 90.

There is no evidence of what Bechtel & Co. may have paid for this property. Bulmahn was the general manager of ISU and of all its properties. In a letter of January 11, 1924, from Bulmahn to Lee the writer referred to Lee's letter of the day before, and said:

"Regarding the Grinnell situation, I believe we can work out this on the basis you mentioned in your telephone conversation yesterday, but I am getting some data which I will check tomorrow and which will permit me to recheck the whole matter, and I will call you on the telephone then. Incidentally, I expect to be in Newton Monday and at that time will check up the heating system at Grinnell, the physical condition of which seems to me important. I would be interested in knowing whether the purchase price you mentioned to me yesterday is all based on cash or whether part of it is stock as you had it lined up the last time. This, of course, makes some difference in the carrying charge."

This letter was just prior to February 1924, or the time Lee told the board that Bechtel & Co. had made arrangements to acquire this property on its own account. It is apparent that ISU, and certainly its general manager, was being informed of Bechtel & Co. plans. Bulmahn may have been trying the difficult task of fairly serving two masters.

On August 29, 1924, which was during the time that Bechtel & Co. possessed the Grinnell property under the lease and purchase contract, Lee wrote to Bulmahn, thus:

"This is practically the first time the writer has been in the office since your letter of July 21, regarding the proposed extension to Reasoner from the Grinnell system. The writer has given the matter consideration, and we believe that the best way to handle the extensions will be in the name of the Iowa Southern Utilities Company, issuing Iowa Southern First and Refundings for payment of the work. While in the East last week, indications pointed to the release of the Grinnell property within ninety

days, and for that reason we believe it feasible to conduct affairs as though we owned the property. Furthermore, in case difficulties should develop, and the Iowa Light, Heat & Power Company goes into the hands of a receiver, we believe that the trustee under the Iowa Southern bonds might be able to establish a preferred claim. At least it would create a very jangled mess, with the odds favoring the Iowa Southern."

On the letter is this notation with lead pencil by Mr. Bulmahn: "E.L.S. Please see me about this." These Bulmahn-Lee letters and the telephone conversation referred to and the note to E.L.S. (Edward L. Shutts) suggest the query of whether Geo. M. Bechtel & Co. ever negotiated for this property, leased and took possession of and improved it, or contracted for the purchase, on its own account or expended any of its money on it. The natural assumption would be that the interest and attention which Mr. Bulmahn was giving to the matter was in behalf of ISU. In referring to the chance of this Grinnell utility company being placed in receivership it was the expressed thought of Mr. Lee that it was ISU that would be the claimant-creditor with the probability of establishing a preferred claim, and not Bechtel & Co.

Negotiations for this property were in progress before November 17, 1923, as indicated by a letter of that date from George M. Bechtel to E. F. Bulmahn, in which the latter is thanked by the writer for his "confidential report and copy of letter which you wrote to Ross [J. Ross Lee] relative to the Grinnell situation. We have had some pretty warm conferences here over Grinnell, but I think they have quieted down now and are willing to try and make a decent purchase. I appreciate very much the help you have given me."

There is unquestionable evidence that any negotiations for this property by either Lee, Geo. M. Bechtel or Geo. M. Bechtel & Co. were for and on behalf of the Iowa Southern Utilities Co. On June 10, 1924, a special meeting of the board of directors of that company was held, at which Geo. M. Bechtel presided as president, H. R. Bechtel was secretary and E. F. Bulmahn and Mr. Lee were present as directors. On page 59 of Volume II of the Corporate Records of the Company is the following:

"E. F. Bulmahn offered the following resolution which was seconded and unanimously carried. Be It Resolved that Mr. J. Ross Lee, vice-president of the Company, be authorized and directed to enter into negotiations with the Iowa Light, Heat & Power Company for the lease and purchase of what is known as the Grinnell property of the Iowa Light, Heat & Power Company, said property being located in the counties of Poweshiek and Jasper * * *. And the said J. Ross Lee is further authorized and empowered to execute on behalf of this Company any such lease and contract of purchase as in his judgment is deemed advisable and for the best interests of the Company."

The minutes of the meeting were signed by Geo. M. Bechtel, President, H. R. Bechtel, Secretary, and by Geo. M. Bechtel, H. R. Bechtel, Frank S. Payne, E. F. Bulmahn and J. Ross Lee, directors.

The lease and the contract of purchase was not produced by defendants. Mr. Lee died before the trial. H. R. Bechtel was a witness for the defendants. Geo. M. Bechtel spent much time at the trial, but was not a witness. There is no evidence other than the statement of Mr. Lee in the minutes of the board meeting of January 15, 1926, that Geo. M. Bechtel & Co. expended $37,500 on the property. The property was purchased and paid for by ISU. It is highly improbable that Geo. M. Bechtel & Co. expended any money improving the property. There is no evidence of what the purchase price was. The offer was intended to induce the belief that it was $712,500. The Iowa Southern Utilities Co. paid $750,000 and we find it sustained a loss of at least $37,500.

The trial court accepted the testimony of H. R. Bechtel, as read from his testimony in the bankruptcy litigation, that the loose-leaf ledger of Bechtel & Co. showed its profit as of February 19, 1926 in this transaction was $30,916.96. Any profit which it took, whether that sum or more, was fraudulently and unlawfully taken from the Iowa Southern Utilities Company.

Division 10—Iowa Gas & Electric Company of
Washington, Iowa.

There is in the record a copy of a contract made on September 11, 1924, by George S. Carson of Iowa City, as vendor, and Geo. M. Bechtel, as vendee, who agreed to buy the entire common capital stock of the Iowa Gas & Electric Co., consisting of 4000

shares of the par value of $100 each, for the consideration of $450,000 in cash and 3000 shares of 7% cumulative preferred stock of ISU to be paid as follows: Upon signing the contract vendee agrees to deliver to vendor $10,000 in cash and 400 shares of said preferred stock, with the balance to be paid on or before February 1, 1925. The vendee was to take possession of the property on September 11, 1924, and to assume responsibility for its operation thereafter. The vendor agreed to co-operate with vendee in causing preferred stockholders of the Iowa Gas & Electric Co. to exchange said stock for preferred stock of ISU.

The next day, September 12, 1924, Geo. M. Bechtel wrote E. F. Bulmahn of this purchase. The letter, after mentioning some advantages in the combining of this property with ISU, stated: "With the strategic location of this property we deem it advisable to accept their price of $750,000, $300,000 of Iowa Preferred and $450,000 cash."

On September 17, 1924, J. Ross Lee wrote Mr. Bulmahn, the vice-president, treasurer, and general manager of ISU, stating:

"In accordance with our telephone conversation of a few moments ago, we are hastening to enclose herewith a copy of an agreement entered into on September 11th for the purchase of the property known as the Iowa Gas & Electric Company. You will note from this agreement that we have purchased the common stock * * * and therefore it will be necessary to operate the Company under the name of the Iowa Gas & Electric Company, until we are able to consolidate same with the Iowa Southern, which will be a short time after we clear the Burlington property, the exact time depending upon when we secure the consent of the preferred stockholders of the Iowa Gas & Electric Co. to exchange their stock for the Iowa Southern preferred."

After stating that "possession and all responsibility for operation is now with us", and that their local manager "must look to you for instructions" and "we also feel that you should work out with them whatever arrangement you desire in regard to monthly reports, etc.", and that Mr. Shutts should go to Washington as soon as possible and prepare a balance sheet as of August 30, the letter concluded thus: "We believe it advisable, also, to start construction from Washington to Sigourney in order

to get the benefit of the cheaper generating current at Washington over to our Sigourney station. This material can be purchased either in the name of the Iowa Southern or in the name of the Iowa Gas & Electric, whichever, from your standpoint, will be the easiest to handle."

On October 1, 1924, Mr. Bulmahn wrote Mr. Lee for his audit of the Washington property as of July 31, and stated that he and Mr. Shutts were going to Washington the following week to bring the audit down to date. On October 22, 1924, Mr. Bulmahn wrote Mr. Lee a letter enclosing a copy of the report of Mr. Shutts on the Washington property, together with August 31st balance sheet and earnings statements for July and August. The letter also stated:

"In his report he refers to several matters which may have some bearing on the purchase price, as I understand the final price was based on certain representations of liquid assets over liabilities, and if the comments he makes do affect this in any way, I presume you will use them, and you may rest assured that they represent conditions as they exist. In this connection we have been giving general supervision of the operation of the Washington property, preliminary to its consolidation with this property, which I presume you want us to do."

Mr. Lee acknowledged receipt of the letter and its enclosures on October 25, 1924, and stated: "* * * we are filing the same to be used at the time the deal is finally consummated."

An office carbon copy of a letter from Mr. Bulmahn to Mr. Lee, of April 11, 1925, indicates that the Iowa Gas & Electric Co. was so used and operated in 1924, after the execution of the Carson contract, by the Iowa Southern Utilities Co. that it was included in the latter's Federal income tax report for 1924. This letter stated:

"I attach, hereto, letter from the Internal Revenue Department regarding our income tax on the Washington property. This movement, I understand, was initiated by the Department and not by the company. * * * Unquestionably, we would get some tax reduction if the property were properly depreciated, and I presume this earning would accrue to us under our contract, but there are several matters to take into consideration.

*First, we would reduce our property account, which would hurt the present balance sheet. Of course, when Washington is absorbed by this company, it will appear on our balance sheet at the purchase price so that this may not be important. \* \* \* From all appearances, the former owners of the Washington property did not depreciate their property in order to show a better earnings statement to their banks."* (Italics ours.)

As will appear hereinafter, this is just what the ISU always did, and it was done to increase their assets on paper and make their balance sheets look better than they should look, and to promote sales of preferred stock. When the larger issues of such stock were made it was the practice of ISU, Geo. M. Bechtel & Co., and W. C. Langley & Co. to issue and publish printed circulars in which much of the current balance sheet was set out.

The capital stock of the Iowa Gas & Electric Co. consisted of 4000 shares of common stock, 2000 shares of First Preferred Stock and 718 shares of Second Preferred Stock of a total par value of $671,800. Only the common stock was included in the Carson contract. When and from whom or at what price Geo. M. Bechtel acquired the preferred stock does not appear in the record.

At a meeting of the ISU board on May 12, 1925, at which Geo. M. Bechtel, as president, was chairman, and H. R. Bechtel was secretary, with all remaining directors, Payne, Nyemaster, Bulmahn and Lee present, the chairman stated that Geo. M. Bechtel offered all of the common and preferred stock of the Iowa Gas & Electric Company for $1,071,800 in cash. The board unanimously accepted the offer and directed the president and the treasurer (Mr. Bulmahn) to execute the promissory notes and other evidence of the indebtedness. This they did by delivering to Geo. M. Bechtel $600,000 of 7% preferred stock and $471,800 of 6% Gold Notes. The board of the Iowa Gas & Electric Company was directed to transfer all of its property to ISU. All officers and directors signed the minutes. J. Ross Lee was one of these directors and he was present at the meeting. Nevertheless, there is in the record a letter of Lee to Bulmahn bearing date of May 19, 1925—one week after the board meeting —enclosing a draft of minutes for a board meeting "which we would like to have written up in our books in connection with

the purchase of the Iowa Gas & Electric Company." The letter also stated:

"By referring to the price at which we have put in the Iowa Gas & Electric Company, you will note that we have added to the contract price that we paid Mr. Carson the sum of * * * $50,000. This sum is money to offset our interest charges while we have had the money into the Common Stock etc., because, as you know, this property has been paid for since the first of January, and the earnings or dividends have not been taken out of the Iowa Gas & Electric. Thus the Iowa Southern is getting a better current asset sheet than they would have had otherwise, and it is merely drawing it into the capital account. We have checked here and it figures that the amount we have put in is practically required to let us break even on this transaction."

' The letter also gives instructions for the issue of 6% Gold Notes and preferred stock to pay the purchase price. Inconsistent with the statement that Carson had been paid since January, the letter directed ISU to issue to Mr. Carson $238,200 par value of Iowa Southern preferred stock.

It is a reasonable inference that Lee had given the information contained in the letter at the board meeting on May 12, 1925, otherwise the consideration stated in the minutes would have been $1,071,800—$50,000 or $1,021,800—and that he then confirmed his oral statement by his dictated-but-not-signed letter of May 19.

The statement that the $50,000 just about covered the interest charge is a gross exaggeration. From the data in the record we figure the interest charge was less than $8000. The claimed fact that Bechtel took no earnings or dividends out of the Iowa Gas & Electric is explainable. The general ledger of the Gas & Electric Company shows that in May 1925 the Surplus Account had a debit balance or deficit of $119,222.42.

The record on the acquisition of this property by ISU from Mr. Carson shows that without question the entire transaction was financed with its funds. What did it get for its money? On December 7, 1922, Day & Zimmerman submitted to the Chicago Trust Company a report and inventory and appraisal of the Iowa Gas & Electric Company and its property, in which they

stated that as of December 1, 1922, the reproduction cost new of the property was $1,524,270 plus a going-concern value of 10% of the latter figure, or $152,000, making a total of $1,676,270, and that after deducting accrued depreciation, the reproduction cost new less accrued depreciation was $1,440,925, including said going-concern value. There was also an appraisal by J. B. Hill of $112,482.10 worth of property in Louisa County which was included in the transaction. Adding this appraisal to that of Day & Zimmerman makes the combined appraisal $1,553,407.10. This property was subject to the following bonded debt: First-Mortgage 6% bonds of $785,000 less $36,600 held alive in Sinking Fund, leaving a balance of $748,400; also First and Refunding 6% Gold Bonds of $169,000, making the total bonded debt $917,-400. ISU took the property subject to this obligation which it assumed and agreed to pay. The total consideration for property, valued by disinterested appraisers at $1,553,407.10 was therefore $1,071,800 plus $917,400 or $1,989,200 which was $435,792.90 in excess of its appraised value.

Let us take another view of the matter. The general ledger of the Iowa Gas & Electric Co. in May 1925 showed the book value of its fixed assets at $1,406,106.76, less a depreciation reserve of $186,632.86, or the depreciated book cost of fixed assets at $1,219,473.90. To this amount was added current and other assets of the value of $202,982.08. The value of its going business or going-concern value it entered as $140,237.66. This made its total assets $1,562,693.64. Its total liabilities, including accrued interest, taxes and other obligations in addition to its bonded debt, were $1,008,678.31. Subtracting the total liabilities from the total assets shows the excess of assets over liabilities or the net worth of the property was $554,015.33, for which ISU paid $1,071,800 or an overpayment of $517,784.67.

Just what profit Geo. M. Bechtel may have made in this transaction is difficult to determine, but it is clear that, wrong-fully and in breach of his official and trust relation to ISU, he forced upon it a property at a consideration and cost to it far in excess of its fair value. This appears from the books of the Gas & Electric Company, and also from the valuations of dis-interested appraisers. On the basis of these appraisals we find the loss suffered by ISU in this transaction was $435,792.90. The

trial court fixed this loss at $30,613.50, which was the amount H. R. Bechtel testified was the profit shown by the books of Bechtel & Co.

There is another matter connected with this transaction, which has no direct bearing upon it, but is pertinent to another issue to be referred to hereinafter. On October 25, 1924, J. Ross Lee wrote to Mr. Bulmahn, thus:

"Mr. Geo. Carson seems to be greatly worried that it is leaking out somewhere regarding the price and terms under which he sold us the Iowa Gas & Electric Company. * * * the writer is wondering if the copy of the agreement which was mailed you happened to be in such a place that some of the employees were able to read it and divulge this information."

Mr. Bulmahn replied to the letter of Mr. Lee on October 26, 1924, stating:

"I am at a loss to understand how anyone here in Centerville, except myself, is able to give out any information concerning the details of the contract between Mr. Bechtel and George Carson. Upon receipt of the copy of the contract which you sent me, it was immediately placed in my personal file, and as far as I know, no one, including the employees in the office here, has ever seen it. *I am considerably concerned about this because it is the first instance I have ever known where any information has leaked out of this office which was not intended to be made public."* (Italics ours.)

Division 11—Did the Bechtels acquire the properties noted in the preceding Divisions with their money before the sales to ISU?

The repeated contention of the Bechtels in the trial below that they first purchased these properties and then sold them to the Iowa Southern Utilities Company has been repeatedly reasserted in this court. Harold R. Bechtel testified that Geo. M. Bechtel & Co. "offered several functions for the ISU in connection with development of the Company. One of the functions was that they acted as its banker, in other words, we were providing them with money at such times as additional money was needed. And they assisted in the financing of the Company's acquisitions

on a more permanent basis than the ordinary banker would do, where you borrow money for a short time only. In addition to that the Company acted in the relationship of—well, I don't know just how to express it—in the relationship of negotiators for the properties that were being acquired. They made studies of situations to find out what the possibilities were, whether the acquisition might be a judicious one, both from a buyer's standpoint and from the physical relationship." He testified that these "functions" began in 1923 and continued until 1930 or 1931. Active in their performance in addition to himself were J. Ross Lee and E. F. Bulmahn, aided by the counsel and advice of Geo. M. Bechtel, Frank S. Payne and Ray Nyemaster.

Asked as to the method of financing ISU, H. R. Bechtel testified that they "raised money in about all the ways possible to raise money for a corporation: 1. By issuing bonds covered by mortgage or trust indenture. 2. By issuing so-called Gold Notes of the company which were not secured by indenture. 3. We borrowed money by issuing debenture bonds secured by a trust agreement but not secured by a mortgage; we borrowed money for the company by temporary bank loans; and we raised money by the sale of preferred stock of the company." These evidences of indebtedness of which the witness spoke were securities of the ISU, and not obligations of Geo. M. Bechtel & Co.

Except for some small early issues, substantially all of the preferred stock of ISU was issued as an original issue to Geo. M. Bechtel & Co. or to its nominees. It was a major method of financing from 1923 to 1931. The practice was for the Bechtel company to take the stock at par. A "Geo. M. Bechtel, Banker Account" was carried on the books of ISU, and a counterpart of it was an account carried on the books of Geo. M. Bechtel & Co. When stock was issued to that company at par and accrued dividends it was not paid for, but a credit for the amount to ISU was entered in the said account on the Bechtel company books, and in the "Geo. M. Bechtel & Co. Bankers Account" in the ISU books a charge was made against Geo. M. Bechtel & Co. for the amount. When an issue of stock was sent to the Bechtel company it would sell what it could direct to its customers. Other shares it would send to the home and branch offices of ISU for sale by its employees to local buyers. The selling price

to them would be par and accrued dividends. The employee selling would receive three points or $3.00 a share as a commission and his district manager would receive $1.00 a share. ISU would debit the Geo. M. Bechtel, Banker Account with $4.00 and credit it with $96, which it would retain.

The greater part of any large issue of stock sent to the Bechtel company would not be retained by it for investment but would be resold to other stockbrokers or large investors. Such an outlet was early developed with Hoagland, Allum & Co., of Chicago, and Paul H. Davis & Co. and W. C. Langley & Co., of New York City. The first sale to the last named company was at 78. Sales were made from that price on up to 90 or a few points above. The Langley company soon dominated these stock purchases from Bechtel & Co. largely through priorities and preferences accorded by the latter company, and by some commissions split with it.

The proceeds which were received by the Bechtel company from these sales were used by it in the purchase of properties that were then sold to ISU at inflated prices, for which Geo. M. Bechtel & Co. was credited in its Bankers Account on the ISU books. The proceeds of any preferred stock sales not so used were credited to ISU in its account on the Bechtel company books and redeposited by Bechtel Co. to its credit in its depository banks.

Mr. Bulmahn, the treasurer of ISU, would inform the Bechtel company periodically of the money requirements, and Mr. Lee normally made the determination as to the method of financing to be used in meeting the requirements. Although all money was procured in the manner above-stated, H. R. Bechtel again reiterated in his testimony in answer to a leading question of his attorney: "Yes. The furnishing of money was our responsibility, our obligation." This was true only in the sense that they marketed the securities furnished by ISU, as the record definitely shows.

As appears from the testimony of H. R. Bechtel, supra, he and his father and Lee, Bulmahn, Payne and Nyemaster were all officers or directors of ISU, and as such, and as "negotiators", as he expresses it, they were engaged in acquiring properties for ISU. They were not vendors acquiring them for sale to ISU. That Company was entitled to any net profit made by Bechtels

in each instance because of the fiduciary relationship between these "negotiators" and ISU. Each of these men knew the cost to the Bechtels of each of the properties and the price at which each was acquired by ISU and the profits to the Bechtels. There is evidence that Mr. Bulmahn was consulted about the prices that Bechtels paid and about the prices which ISU, the Company of which he was vice-president, treasurer, and general manager, should pay for the properties. Mr. Lee shared in these profits and he and Mr. Bulmahn shared in large management fees paid by ISU to the Bechtel company, which we will discuss hereinafter.

When asked by his attorney what was the purpose and the reason for charging a higher and additional price to ISU than the acquisition cost to themselves, the answer of H. R. Bechtel was: "The purpose was to compensate Geo. M. Bechtel & Co. for their costs in the acquisition of the properties acquired, and also to compensate them for their costs in studying and inspecting properties, which, for one reason or other were not finally acquired. And to some extent the purpose was to make a profit— I don't think it was to make a profit."

The deposition of John F. Krause, taken in Los Angeles, was read by plaintiffs. He was an expert accountant who began work for the Bechtel company in 1924. He set up a new bookkeeping system and remained with the company until the bankruptcy proceedings in 1933. His testimony was that Geo. M. Bechtel & Co. was not a bank and was not operated as one. It never had cash in its till to pay a check of any substantial amount. Its money or the money of its customers was deposited in other banks. Customers never had accounts there against which they wrote checks. Their customers were bond-and-stock buyers and their money was deposited by the Bechtel company in its name in other banks. There was a book kept in his office called the "Utilities Ledger", in which was kept a record of the proceeds received from sales of bonds and stocks. He testified:

"When an issue of stock or bonds was received from the Iowa Southern Utilities Company we would charge stock account into our inventory of stock on hand, and we would credit the account of Iowa Southern Utilities Company. When they sent us securities it was for the purpose of building up our credit account

large enough to absorb a property that we were preparing to turn over to them. We built up a credit to their [Bechtels'] account large enough to absorb the cost of this property to them and it balanced out. Some of the properties were small and did not require a lot of financing. But if the property was large it required going out and placing these securities in order to build up a credit so they could take it over out of the proceeds of these securities. The same system was used with reference to both stock and bonds. Q. When these large blocks of stock would come down from Iowa Southern, for which you said you gave them credit, did George M. Bechtel & Company have the money either in cash, in their till, or money in the bank to pay for them? A. No, sir. It was simply a bookkeeping transaction so far as credit was concerned."

The witness testified that J. Ross Lee was the general manager of Geo. M. Bechtel & Co.

Instead of Geo. M. Bechtel & Co. being the banker for ISU, the reverse was true. ISU was the banker for Bechtel & Co. In their accounts with each other Geo. M. Bechtel & Co. was almost continuously heavily indebted to ISU. The trial balances on the ISU books show as follows: On December 31, 1925, the Bechtel company was indebted to ISU, $173,316.94. Without stating the amounts there was a debit balance against Bechtel & Co. on the last day of each month of 1926, and on December 31, 1926 it was $429,511.94. The same is true in 1927, and on December 31, 1927 it was $293,343.03. The same was true in 1928, with a debit balance on the last day of that year, $343,966.01. It was true in 1929, with a debit balance against Bechtel & Co. on December 31 of $401,759.73. In 1930 these monthly debit balances were: for January, $378,052.57; February, $528,911.82; March, $493,604.82; April, $631,483.30; May, $1,693,767.49; June, $1,185,711.93; July, $1,221,291.27; August, $1,205,162.78; September, $1,142,607.46; October, $1,009,056.25; November, $639,628.02; December, $385,658.23.

In 1931 this debit balance was $715,258.40 on January 31, and continued without much variation until November 30, when it was $832,918.33. In December 1931 the Bechtel company owed ISU $535,967.14 for funds of the latter on deposit with them. The Bechtel Co. substituted its note for this debt, and the deposit.

1052

The Bechtels also made investments in the Biloxi (Mississippi) Hotel and in the Blackhawk Hotel Corporation which resulted in losses. In the Bechtel bankruptcy proceeding there is evidence for the trustee that the liabilities of Geo. M. Bechtel & Co. as of May 31, 1933 were $1,471,564.24 and exceeded the assets of $637,566.23 by $833,998.01.

Division 12—Geo. M. Bechtel & Company
note for $586,761.77.

As stated above, there was a debit balance against Geo. M. Bechtel & Co. in December 1931 for $535,967.14 which it owed ISU for a deposit of that amount with the Bechtel company, belonging to ISU. A special meeting of the board of directors of ISU was held at Davenport on December 31, 1931, at which Geo. M. Bechtel presided and H. R. Bechtel was secretary, and Mr. Lee and Mr. Nyemaster were present as directors. A resolution was unanimously adopted, which, after stating "WHEREAS etc." a number of times, continued:

"SINCE in the past to comply with the laws and regulations of the State of Iowa it has been necessary for this Company to receive par for its preferred stock sold, and SINCE the Geo. M. Bechtel & Co. from the years 1922 to 30, inclusive, have purchased the preferred stock of this Company at par, experiencing a loss on the sale of this stock of * * * $586,761.77, and SINCE there is now on deposit with Geo. M. Bechtel & Co. * * * $535,-967.14 which deposit in effect provides Geo. M. Bechtel & Co. with funds in lieu of their own funds used in paying to this Company for the discount on its preferred stock, IT IS RESOLVED that this Company lend the Geo. M. Bechtel & Co. * * * $586,-761.77 on Geo. M. Bechtel & Company's note for ten years without interest, and, WHEREAS the Company must borrow certain other moneys which Geo. M. Bechtel & Company agree to lend to the maximum ability.

"Now THEREFORE, in consideration of the above stipulations, the Treasurer of this Company be and is hereby authorized and directed to accept a note of Geo. M. Bechtel & Co. for * * * $586,761.77 to mature December 31, 1941, and drawing no interest, as an offset against the deposit of this Company with Geo. M. Bechtel & Co. to the amount of said offset, the balance to be

carried as a deferred liability of this Company to an associated company."

The minutes were signed by the Bechtels as president and secretary, and by H. R. Bechtel, Ray Nyemaster and J. Ross Lee as directors.

On January 28, 1932, Edward L. Shutts, auditor of ISU, wrote a letter to H. R. Bechtel stating that: "I have made all of the entries necessary to close out the Geo. M. Bechtel & Co. cash deposit account, crediting Geo. M. Bechtel & Co. with $586,-761.77 and charging our notes receivable, representing the ten-year note which Geo. M. Bechtel & Co. is to give the Iowa Southern Utilities Co. * * *." He asked for the note. A photostat of the note for the amount noted, dated December 31, 1931, due ten years after that date and signed by Geo. M. Bechtel & Co. by "H. R. Bechtel, member of the firm" is among the exhibits. The "deferred liability" mentioned in the resolution, being the difference between the deposit of $535,967.14 and the face of the note, or the sum of $50,794.63, was paid to Geo. M. Bechtel & Co. by check for that amount to it as payee dated April 4, 1932, drawn by ISU by Edward L. Shutts.

By agreement between ISU and the Bechtel company the latter was charged with 6% interest on the daily balances in the ISU account. In the auditor's report of ISU for 1931 by the Arthur Andersen & Company of Chicago, dated April 25, 1932, is this comment: "Non-operating revenue for 1931 includes $35,290.09 interest from Geo. M. Bechtel & Co. that will be non-recurring since the Company has accepted a non-interest bearing note from Geo. M. Bechtel & Co. as of December 31, 1931, as mentioned on page 15 of this report." On that page is this statement: "Geo. M. Bechtel has represented to us in a certificate covering the liabilities of the company that in its opinion Iowa Southern Utilities Company has a moral obligation to relieve it from paying the note."

There is evidence in the record to fairly sustain our conclusion that the execution of this note was but the fraudulent device and means of those involved to wrongfully appropriate the amount of the note, with the intention never to pay it.

There was a special meeting of the ISU Board of Directors at the Union League Club in Chicago on September 8, 1933, less

than a year after the note was given. E. F. Bulmahn, vice-president, was chairman and H. R. Bechtel was secretary, and Edward de Rivera was the only other director present. The last named was a partner of W. C. Langley & Co., both of whom were named as defendants in this suit, but being residents of New York no service was had upon them. A resolution was unanimously adopted that, in accord with recommendations of Andersen & Co., a reserve be set up for the full amount of the note as of June 30, 1933. The recommendations were in a letter of Andersen & Company of the same date as the meeting, stating: "In view of the fact that this note is non-interest bearing and does not mature until 1941, and taking into consideration present conditions, it is our judgment that in the interest of conservatism a reserve for the face amount of this note should be set up on the books, and we recommend that the Board authorize the creation of such a reserve by a charge to surplus account as of June 30, 1933." In the Andersen & Company audit of ISU for 1933 it was stated with reference to this note: "Since the collection of this note was considered doubtful, a reserve has been provided by the Company for the full amount."

After this item of reserve was set up the account for depreciation and retirement reserve for approximately $19,000,000 of tangible fixed assets was reduced on June 30, 1933 to zero.

A claim was filed on this note by ISU in the Bechtel bankruptcy proceeding and a dividend or recovery was allowed thereon for $6,002.62. In October 1936 the books of account of ISU show a debit of $6,002.62 to the Reserve for Loss Account and a credit of the same amount to Surplus Account, so that the loss on the note as finally determined was $586,761.77 less $6,002.62 or $580,759.15.

We find that the Iowa Southern Utilities Company sustained a loss on this item of $580,759.15, and not of $586,761.77, as the trial court found, and we also find, as did the trial court, that this item was not discharged in bankruptcy, since it came within the class of debts excepted from discharge under Paragraph (4) of section 17a of the Bankruptcy Act (30 Stat. at L. 550) as it was in 1933, to wit: "Debts created by his fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity."

The Bechtels not only wrongfully took the money of ISU, but they relieved themselves of the obligation to pay any interest thereon for a period of ten years. Just twelve days before doing so, on December 19, 1931, they declared a dividend of $40,000 on their common stock, which they took the same day. The face of the note might have been reduced by the amount of the dividend, but it was not. Defaults in the payment of dividends on the preferred stock followed immediately. Of the four directors who voted for the resolution consummating the note transaction, three of them, Geo. M. Bechtel, Harold R. Bechtel and J. Ross Lee were financially interested therein.

Division 13—Management fees.

██ One of the items for which plaintiffs sought recovery was for money paid by ISU to Geo. M. Bechtel & Co. for so-called management or operating fees for services purportedly rendered to ISU. The checks for the fees were made payable either to Geo. M. Bechtel or to Geo. M. Bechtel & Co. There is no motion, resolution or authorization of any kind in the minute books or in any corporate records for the payment of these fees. We have found none after a thorough search, and Edward L. Shutts, who has been president since June 1937 and was auditor and assistant secretary before that, and Vaughn D. Welsh, who has been assistant secretary and auditor for many years, each testified that there was no record authority. The checks were issued twice a month, as was the practice for all employment checks. The first check is dated January 20, 1927, and the last check June 4, 1932. With very few exceptions all of these ISU checks bore the signature of Edward L. Shutts, without official designation. He testified that he received his instructions from Mr. Bulmahn, who was vice-president, treasurer and general manager during this period, that he never discussed the matter with either Bechtel, and that they did no work at the home office in Centerville and they were seldom there except to attend board or stockholder's meetings. The ISU company served a large number of communities from Creston to the Mississippi River in twenty or more counties in that locality. Mr. Bulmahn had his office at Centerville, and there were a number of district managers at branch offices in the outlying territory.

As a witness for the defense in the suit by the trustee in bankruptcy, Geo. M. Bechtel testified: "After my son, Harold,

became a partner (January 1, 1926) I relaxed my activity in the business. Until the time things began to get critical I did very little except to look over reports and be available for consultation at times. I was interested in some farms and gave my personal attention thereto. * * * In 1932 I borrowed money on policies of life insurance which were payable to my wife. * * * The Iowa Southern paid to Geo. M. Bechtel & Co. $85,000 a year or so in operating fees. I think they got good returns on those operating fees."

There is no evidence of the nature of these services except as hereinbefore stated. H. R. Bechtel testified that Mr. Lee spent much of his time in the interest of ISU, without stating what he did. That he was an important and competent factor in the operations of Geo. M. Bechtel & Company is clearly evident. But it is just as evident that his endeavors and the results obtained were almost wholly to the benefit of the Bechtel company and to himself. There is no evidence of the value of the services of either George or Harold Bechtel or Mr. Lee to ISU, if any were in fact performed.

The record of the payment of these fees on the books of ISU was disguised and concealed somewhat. In fact, they were not designated as "Management Fees" but as "Management Expenses." There was no account bearing the name "Management Fees" or "Management Expenses." There was no separate account of "Geo. M. Bechtel Management Fees." Each check was posted in two or three accounts. For illustration we will take the first issued of these checks, that of January 20, 1927 for $2925 payable to Geo. M. Bechtel. It was issued by direction of voucher No. 107, and states thereon "George M. Bechtel, $2925.00." Its check number "SA783" takes you to a ledger and there the entry is "Gen. Expense 2925", which directs you to general expense ledger and the account entitled "Incidental expense 233aa", and there as "Management Expense" is a charge of $2500. Where is the balance of the check? Examining voucher No. 107 again and you are directed to "Account Number 230aa" entitled "Officers Salaries" and there is a charge of $425 under the heading of "Proportion of general expenses." This single voucher and single check for $2925 is split and posted in two separate accounts, in neither of which does the word "fees" appear.

These entries are, in general, typical of the entries with

reference to each of these checks. Each bimonthly check from January 20, 1927 to May 7, 1928, inclusive, is for $2925; from May 28, 1928 to October 22, 1928, the amount is $3025; from November 5, 1928 to August 5, 1929, the amount is $3125, thereafter the amounts vary from $5265 to $2632.50. The total amount of these checks for management fees as we compute them is $371,835, but we accept the computation of $370,370 from the testimony of plaintiff's accountant. The trial court apparently accepting the figures on Exhibit 404.1 found the loss was $312,-250, but that part of each check entered in "Account No. 230aa" was not included in the computation. The bookkeeping might puzzle the average stockholder had he been permitted to examine the books.

These management fees were a part of the income of Geo. M. Bechtel & Co., and H. R. Bechtel testified that J. Ross Lee, E. F. Bulmahn and perhaps others shared in them. The payment of management fees had been discontinued at the end of 1931, but were resumed later, as appears from a letter of H. R. Bechtel of April 30, 1932, to W. C. Langley, as follows: "I appreciate very much your letter of the 27th. As you no doubt know from the tone of my letter, we are almost driven crazy out here. Our situation is not primarily due to Iowa Southern Utilities Company's hardships * * *. The situation as regards Geo. M. Bechtel & Co. is not at all good, you have only an indirect interest there. In order that we may live it has been necessary to re-establish the management fee of $5000 per month and this month the Company paid us for the month of March and the first half of April." Later the payments were discontinued.

We find the loss of Iowa Southern Utilities Company on this item was $370,370.

Division 14—Dividends on the common stock.

The original issue of common stock by the Iowa Southern Utilities Company was 10,000 shares. Geo. M. Bechtel acquired all of this. Fifty-eight hundred shares were issued to him in exchange for the same number of shares which he held in the Maine corporation. The remaining 4200 shares were issued to him in the Burlington Railway & Light Co. transaction. Although it had no-par value it was carried on the company books at $1,000,-000. On December 21, 1926, the common capital stock was increased to 100,000 shares of no-par value. This increase was

based upon no new assets or fresh money added to the capital assets, but it was merely an increase in the number of shares representing the existing capital. In 1927 the 10,000 existing shares were surrendered and canceled in return for the new issue of 100,000 shares, the book or stated value of which remained at $1,000,000. Geo. M. Bechtel held 60,000 shares, and Harold Bechtel held 40,000 shares. Each of the remaining directors held three shares of the stock of Geo. M. Bechtel as qualifying shares.

The total dividend checks of $678,000 were issued as follows:

Dec. 31, 1923—$29,000 Dec. 31, 1927—$40,000 Dec. 31, 1929—$40,000
Dec. 31, 1924—$29,000 June 30, 1928—$36,000 June 30, 1930—$60,000
Dec. 31, 1925—$60,000 June 30, 1928—$24,000 Dec. 31, 1930—$40,000
June 30, 1926—$60,000 Dec. 31, 1928—$40,000 June 30, 1931—$60,000
June 30, 1927—$60,000 June 30, 1929—$60,000 Dec. 19, 1931—$40,000

Checks of $1.20 or $1.80, as the case might be, for the three qualifying shares held by some of the directors were made payable to each and endorsed by each and delivered to Geo. M. Bechtel for collection by him. The following is a typical letter showing this. It is from Mr. Shutts to J. Ross Lee dated December 31, 1930, remitting for a dividend of 40 cents a share: "We enclose dividend checks for $1.20 each, payable to E. F. Bulmahn and Frank S. Payne. These checks have been endorsed by Mr. Bulmahn and Mr. Payne and should be turned over to Mr. Bechtel as a part of his dividend on Common Stock."

Dividends were declared without much regard to adequacy of the available earnings or surplus, as appears from the following letter of December 26, 1925, from Geo. M. Bechtel to E. F. Bulmahn: "In regard to the dividend on the Common Stock for 1925, will you please put in the same record of meetings that you had for 1924, and this dividend to be payable during 1926 at the discretion of the treasurer." The resolutions in the minute books show other dividends declared with similar conditions.

On January 5, 1929, Mr. Bulmahn wrote to Harold Bechtel, thus: "I attach hereto vouchers covering the Common Stock Dividend declared at our last meeting. Yours and your father's dividend we have taken care of with a demand note. I thought you might as well have the interest on this from January 1st * * *."

That these dividends were not always paid from earnings or surplus in the company's deposit in the First National Bank of Centerville, but from the proceeds from the sale of ISU securities left with Geo. M. Bechtel & Co., appears from this letter of Mr. Shutts, of June 27, 1930, to J. Ross Lee: "In the last paragraph of your letter of June 26, you state that at the time you mail us additional funds you will also include the $40,000 to meet the July 1 dividend on the preferred stock. We assume that you intended to say that you would send us $60,000 to meet the July 1 dividend on the common stock. We are preparing vouchers for the common stock dividend and will hold them until we receive further advice or fund to cover."

It might be presumed that Mr. Bulmahn, as vice-president, treasurer and general manager, and that Mr. Shutts, as assistant secretary and auditor, and the board would know whether the earnings or surplus of ISU would justify the declaration of a dividend, but the following letter of June 29, 1928, to Mr. Bulmahn from J. Ross Lee indicates that such a decision was not for them, to wit: "Just received from Ed Shutts copy of minutes of a special meeting of the Board of Directors of the Iowa Southern Utilities Co. of Delaware authorizing the surrender of the Burlington bonds and also the declaration of the Preferred Stock dividend due July 1st. Will you please have these minutes rewritten and include in the minutes the declaration of a Common Stock dividend of 60 cents—the same dividend as was declared for July 1, 1927." Mr. Shutts's letter of July 5, 1928, to Mr. Lee informed him that the minutes of the meeting of June 9, 1928 had been rewritten to include common stock dividend of 60 cents a share.

Another factor of great importance in the matter of declaring common stock dividends was the violation by its officers and directors of sound administration and accounting principles in their failure to make proper provision not only for the current depreciation of plant and equipment, but their failure to reflect on their books depreciation already accrued on properties acquired by the Company, as noted in the first ten divisions of this opinion, and with respect to earlier acquisitions. All of these properties had been operated for many years and the service life of plants and equipment had been substantially diminished. Be-

fore buying these properties the company had procured their appraisal by competent and independent appraisers and consultants. In their appraisals they computed the amount of the accrued depreciation and reduced the reproduction cost by those amounts. Some of these appraisals are before us and they set out substantial accrued depreciation. But the officers and directors of ISU ignored these appraisals and they not only did not show, nor reflect in any way, on their books of account any of this accrued depreciation in a single instance, but they also set up these properties on the books at the excessive and inflated prices at which they were purportedly sold to the Company by Geo. M. Bechtel & Co., which prices were greatly in excess of the depreciated reproduction cost as determined by the appraisers.

Furthermore, the allowances of the Company for current depreciation or retirement were inadequate.

Another pertinent matter is the abandonment of property. In 1924 the Company bought the Burlington Railway & Light Co., and in 1925 the Ottumwa property. Both of them included street railway systems and power plants necessary for their operation. It was recognized at the time these properties were purchased that heavy paving expense and other factors, including the decline in that type of traffic, would make much of this property useless. A power plant at Burlington with a reproduction cost of about $670,000 was abandoned at once. Annually from 1926 to 1929, inclusive, parts of these street railway systems were abandoned, which had a total reproduction cost new of approximately $3,000,000. They should have been charged off or set apart from the assets. But because the Company had set aside no adequate allowances for depreciation or retirement there was no reserve fund against which these abandonments could be charged. Consequently, these worthless properties, were retained on the assets side of the ledger, resulting in an inflated total. This made the balance sheet look better, which was an important factor in the sale of the Company's stock and bonds.

Andersen & Company in several audits called attention to the inadequate provisions for depreciation, the failure to reflect accrued depreciation on the books, and the necessity of the retirement of useless property. It apparently held up its reports because they were not complied with. This attitude of the Ander-

sen company is noted in a letter of Mr. Bulmahn, of August 10, 1928, to Mr. Lee, to wit: "I was in Arthur Andersen & Company's office today in connection with the income tax returns of the Ia. So. Utilities Co. * * * and learned that an audit report for the year 1927 has been completed and typed, but that it is being held up pending a conference with you with reference to property retirements which have not been taken up on our books. Mr. Jirgel suggested that I write you today advising you that * * * he thought the matter of writing off these retirements should be discussed with you before the report is released. I gathered from Mr. Jirgel's conversation that he is very much of the opinion that these retirements should be recognized, and apparently if the matter is not discussed with you they will qualify their report, no doubt, by pointing out the fact that we have not made these retirements on our books. * * * You will recall that at the time the matter was first brought up that they asked us for the amount of these property retirements and also requested that we send in the appraisals to their office. Now, in connection with this tax matter it will be necessary to send these appraisals to them as they have to send them to their Washington office as a part of the evidence in support of our claim for additional depreciation for the year 1925. I see no way to avoid sending these appraisals to them as we have but a few days in which to furnish the Income Tax Department with the information which they request. However, I expect to be in the office Monday morning and I will appreciate it if you will write or telephone me Monday in the event the possession of these appraisals in their office would be in any way embarrassing to you."

These appraisals which had been ignored when it was the purpose to build up assets in their books to provide a paper surplus on which to pay dividends on both preferred and common stock, and to make a better balance sheet to aid in the sale of securities, were now being used to provide larger deductions on the Company's back income tax returns to get adjustments in Federal income taxes.

The matter was earlier mentioned in a letter of November 2, 1926, from Mr. Bulmahn to Mr. Lee, in which it was stated: "I have discussed your letter of October 27th with Ed Shutts. The matter brought up in his letter of October 25th is something that

we can hardly settle down here because it is really a problem in financing and it is very important, not so much on account of the amounts involved this year but what might happen in the future. For instance, we go into Burlington and tear down the old power station as we did and abandon railway equipment. If these amounts would have to be credited against the original mortgage issue it would seriously affect the amount of bonds we could let down on new construction. * * * I believe, therefore, it is a matter which should be taken up with our attorneys as you suggest, and that the question should be settled with the auditing company before it comes up here again next year. In this connection I might say that our policy at Burlington has not been questioned by the auditors to date, but from their views on some of our other property I am fearful that it will come up in time."

The refusal of Andersen & Company to release their reports is mentioned in a letter of Mr. Shutts of October 23, 1930, to Mr. Lee, thus: "We call your attention to the fact that we have never received a copy of their 1928 audit. It is our understanding that this report was never released, but now that the property abandonments have all been taken care of to December 31, 1929, we presume that we will receive copies of both the 1928 and 1929 reports." After this letter was written and on December 2, 1930, the Andersen audit was released. The report stated that as a result of the application for additional depreciation the Company received Federal income tax refunds for the years 1923 to 1927, inclusive. The report also stated: "In 1925, the Company acquired certain properties at Burlington and Ottumwa. These acquisitions included railway properties and certain power plants. In connection with the latter the possibility of early abandonment was recognized. The Company had recorded these acquisitions on its books at cost although the acquisitions were supported by appraisals made at the time, and made no segregation in its accounts between tangible property and intangible property costs. * * * Inasmuch as these transactions could properly have been recorded upon the books of the Company at the time of the acquisition and inasmuch as the larger portion of the Company's total property has been so appraised, we have given effect to same in our balance sheet at December 31, 1929, although the transactions were not approved by the Board of Directors until

October 15, 1930." The auditing company in its report thus showed the balance sheet as it should have been, months before ISU attempted to comply with the requirements of Andersen & Company.

The board at said meeting adopted a resolution that the accrued depreciation on the properties acquired from 1916 to 1926, inclusive, as determined by independent appraisers in the amount of $2,043,328.30, be reflected on the books of the Company, as of December 31, 1929. In compliance with the resolution this amount of accrued depreciation was "reflected" on the books, but except for stating the amount the entries accomplished nothing. It was not charged against surplus or earnings. As Mr. Shutts testified in substance: We made two entries and charged that amount, $2,043,328.30 to the Plant and Equipment Account, tangible property, which increased that account in that amount, and then we took that same figure and credited it to the Retirement and Reserve Account. These debit and credit entries just offset each other. So far as the books are concerned we had not reduced by these two entries the valuations that were on the property. The net property value was exactly the same as if these entries had not been made. There was no charge-off on net property value. By other entries the abandoned property was put in the "Intangible Capital Account." But as Mr. Shutts testified, it remained on the assets side of the balance sheet and was kept there, and not until August 1, 1938, under the Recapitalization Plan, was it taken off the assets side. Asked if from his long experience as an auditor and accountant that he did not know that the only proper way to take this property out of assets was to charge it against earnings, or profits, or surplus, he answered: "No. There is more than one way to take it off. Q. But that is the way you finally did take it off? A. That is correct. Q. You took it off by charging it against the surplus which had been created by reduction of the preferred stock? A. That is correct. Q. And that was many years after you kept on paying out these common stock dividends? A. It was 1938. Q. During all those years you passed out these common stock dividends, you didn't take it off of the assets side? A. No, of course not."

A transcript of the testimony in the suit by the trustee in bankruptcy against Martha R. Bechtel in 1934 was received in

evidence. Mrs. Bechtel had turned over property to her husband and son, and a note for something over $100,000 had been given her secured by the common stock of ISU. The trustee had sued to recover the stock. The United States District Court held for Mrs. Bechtel and the Circuit Court of Appeals affirmed. Phillips B. Shaw of Summit, New Jersey, vice-president of Loeb & Shaw, whose business was the management and appraisal of public utility properties, was a witness for the trustee. Mr. Shaw had investigated the ISU properties and testified to the value of the common stock. He referred to the fact that the Company had disregarded appraisals of Day & Zimmerman, and had placed the properties on the books at cost prices inflated above the physical values, and in excess of reproduction cost new, and without setting up accrued depreciation. He testified that when the Burlington and Ottumwa railway properties were abandoned the depreciation and retirement reserve was insufficient to write off these abandoned properties: "Therefore to get around this, the Board of Directors, in October 1930 reached up in the air and picked out two million dollars—exactly $2,043,328.30—which they added to the plant, property and equipment account, and they added a similar amount to the depreciation reserve. Then they wrote off the Burlington and Ottumwa properties; in the case of Burlington, $1,871,052.44, and in the case of Ottumwa, $240,449.61, against these reserves that they had so created." The witness said the reserve was insufficient to write off the entire Ottumwa abandonment, and that the balance of about $760,000 was written off in 1933 upon the insistence of Arthur Andersen & Co. Continuing, the witness testified: "Had the company set up on the books the properties purchased on the basis of appraisals and expended out an adequate amount each year for depreciation, its plant and property accounts and depreciation reserve would have been representative of its physical property, but it did not do so. * * * I have considered the past dividend record of the common stock of Iowa Southern Utilities Co. These dividends were paid, I believe, at the rate of approximately one hundred thousand dollars for three or four years prior to 1932. In my opinion, those dividends were paid at the expense of depreciation reserve. I think that is plain, because the Company ends up at the end of June 1933 with no depreciation reserve

whatsoever. If they had not paid a dividend and had set up more depreciation expense yearly, they would have been nearer a reserve that we consider necessary upon the basis of facts."

Another witness experienced in public-utility matters testified that in his opinion the dividends on the common stock had been paid while that stock had been accumulating a huge deficit.

In order to build up an adequate depreciation and retirement reserve against which the abandoned property could be charged there was added to the plant, property and equipment account $2,043,328.30 which represented the accrued depreciation of property therein, or, in other words, the service life thereof which had already been diminished in that amount, and had no rightful place in the property and plant account. Mr. Shutts testified that if this abandoned property had been charged against earnings or surplus for the years 1930, 1931 and 1932 there would have been no dividends for either the common stock or the preferred stock. Without examining the earnings he would not say that this would not have been true for 1928 and 1929 also.

Andersen & Company in its audits had repeatedly questioned the theory of ISU respecting depreciation and retirement reserve in its accounting. In many of its twenty and more audit reports, including that for 1946, are statements such as these: "The Company under the retirement method has provided for retirement losses currently realized, and, in addition, has provided some reserve for future retirements. This method does not contemplate a full provision depreciation as determined by the age and estimated service life of the properties. Subject to the foregoing comments", the audits were submitted. In the reports is this note: "In the Federal income tax returns filed by the company, the amounts deducted for depreciation are computed on the basis of age and estimated lives of depreciable property, as allowed by the U. S. Treasury Department, and, in the aggregate, are substantially larger than the provision for retirement reserve as set forth above."

That there was a substantial difference in the setup of depreciation in the company's books and as stated in its returns for

Federal income tax appears from the following statement (Exhibit D3013):

| "Net Income per Income Tax Report. | | Net Income as per Company books. |
|---|---|---|
| 1929 | ($842,746.77) | $697,597.54 |
| 1930 | (1,094,338.78) | 702,282.10 |
| 1931 | (751,159.12) | 651,320.36 |
| 1932 | 18,200.61 | 456,875.32 |
| 1933 | (26,314.43) | 121,590.51 |
| 1934 | (113,257.65) | 245,044.45 |
| 1935 | (40,828.23) | 282,228.62 |
| 1936 | 108,727.04 | 489,074.79 |
| 1937 | 329,971.87 | 488,912.10" |

The parentheses denote red figures..

A statement by an accountant witness for the plaintiffs sets out the surplus credit balance as of December 31 of each year from 1923 to 1931, inclusive, as shown by the books of ISU. The statement and his testimony show that had not the acquired properties been put on the books in the Plant and Equipment Account at the inflated cost prices, there would have been no surplus credit each year but instead there would have been a heavy debit balance.

The trial court found that $400,000 of the common stock dividends, being those for 1931, 1930, 1929 and 1928, should not have been paid. It is our conclusion that no common stock dividends should have been paid and that the Iowa Southern Utilities Company sustained a loss of $678,000 by their payment.

From 1925 to 1931, inclusive, preferred stock dividends were paid in the total amount of $2,818,596.40. No preferred dividends were paid in 1932 or 1933. In 1934 the dividend was $133,143.32, or about one fourth of the full requirement at the stated annual rates. In 1935 and for some years thereafter the dividend paid was approximately $266,196.74, or one half of the annual rates. Thus, unpaid preferred dividends were annually accumulating.

Division 15—Bechtel commissions on
preferred stock sales.

The records of ISU show that in 1931 and 1932 there were paid from its funds to Geo. M. Bechtel, H. R. Bechtel and Geo. M. Bechtel & Co., as commissions, in the aggregate amount of $115,720 for sales of preferred stock of ISU to themselves. These

unauthorized and unlawful commissions were received and converted to their own use while officers and directors of ISU, in violation of their official duties and obligations and the fiduciary relation which existed between them and the Company and its preferred stockholders. We find, as did the trial court, that ISU sustained a loss thereby in the sum of $115,720.

Division 16—Officers salaries.

The minute books of ISU are not very specific with respect to the salaries of its officers and we have examined all of the twelve large volumes which are before us. There are some resolutions stating the annual salaries of some officers, but for the most part the resolutions simply say that the "salaries shall remain the same." Quite frequently increases in salaries to different officers and district managers were given by resolutions. The only way to ascertain what any officer was being paid is to search through the pay roll registers and total the bimonthly payments. These books are numerous and large—several inches thick and two feet square. A stockholder or other person, though familiar with bookkeeping, if he could get permission to look at the corporate books and records, would spend much time and effort in ascertaining what either George or Harold Bechtel received as salaries.

Plaintiffs seek recovery for salaries paid to Geo. M. Bechtel and H. R. Bechtel. The latter was paid a total of $83,-754.17 for the years 1923 to 1943, inclusive. For the same period Geo. M. Bechtel was paid $134,104.17. During the last ten years of this period the board fixed the annual salary of each, one or more times. After the end of his service as president of the company, Geo. M. Bechtel was named chairman of the board about 1933 or 1934 at a specified salary. He held this office until he and Harold resigned in 1943. Each of them but rarely missed a stockholders meeting, or the many annual and special board meetings. Some were held in Centerville, in Davenport, in New York City, and many at Union League Club in Chicago. Each of them performed many services and official duties. Their salaries were not excessive. It is not the province of a court ordinarily to interfere with the internal operations of a corporation in the selection of its officers or the designation of official salaries.

We find the plaintiffs are not entitled to recover on this

item. Plaintiffs complain of salaries paid to J. Ross Lee and to Edward de Rivera. What we have said of the Bechtel salaries applies also to those two instances. Edward de Rivera was not in court.

### Division 17—Bechtel bond and note commissions.

From 1923 to 1932 Geo. M. Bechtel & Co. sold in excess of $13,000,000 of bonds, notes and other securities, not including preferred stock, issued by ISU. Plaintiffs claimed, and there is evidence to support the claim, that the discounts and commissions received by the Bechtel company aggregated $1,123,719.44. They contend that this amount was unlawfully taken as officers and fiduciary agents of ISU. That they were not within the protection of Article XI of the Certificate of Incorporation we think is clear in that a majority of the directors during that period were financially interested in the transactions. The commissions and discounts varied. For a period of time the board by resolution granted the Bechtel company a commission of 10% on the face of the securities. While there is little evidence as to what was being paid generally as a commission in such sales, we think the record justifies us in finding that 10% was a fair commission and that charges made by Bechtel were not excessive.

Of the $13,500,000 of securities, we are satisfied from the record that the proceeds from the sale of over $1,000,000 of these securities were appropriated by the Bechtel company because of the fraudulent and excess prices at which the property was delivered to ISU, and that the commissions on this amount should be borne by it. We find, therefore, that the loss sustained by Iowa Southern Utilities Company on this item was 10% of $1,000,000 or $100,000.

### Division 18—Appanoose and Sunshine Coal Companies.

In September 1925 the Appanoose County Coal Company was incorporated as a Delaware corporation, with the Bechtels, Lee and Bulmahn each owning 1250 shares of stock. From the organization until 1933 they were the officers and directors. On September 25, 1925, the Iowa Southern Utilities Company advanced to the Company $500. On the thirtieth day of that month the Bechtels delivered to the coal company mines and

equipment at $25,000 and 200 acres of land with coal rights at $50,000, and received in payment $50,000 of its common stock, and $50,000 of its bonds at 90. Bechtels had acquired the land from the Sterling Coal Company and one Stickler. For part of this land and for other purposes ISU paid $6118.20. Between September 15, 1925 and August 20, 1930, ISU advanced to the coal company cash at twenty-eight different times in a total amount of $90,625 in addition to the $6118.20. The funds of ISU were used in the organization and operation of the coal company. Mr. Shutts opened its books and they were kept under his supervision, and he made frequent reports to the Bechtels of the operation of the company. For all of these services he testified he received no compensation. Bulmahn supervised the operations of the Company, and the services of Mr. Deininger, a superintendent of ISU, were also used. From 1925 to 1931 the coal company made a net profit of $151,360.42 from which the Bechtels, Lee and Bulmahn took dividends of $112,000. The coal company bonds were paid off in 1928 and 1929. In June 1931 the Appanoose County Coal Company was merged with the Sunshine Coal Company which was owned by four members of the Hamm and Carpenter families. The stock was so distributed that the Bechtels and Lee had controlling interest in the merger. The stock interest of Mr. Bulmahn was carried in the name of J. R. Hamm and H. R. Bechtel. In July 1931 ISU entered into a contract with the Sunshine Coal Company to buy a minimum of 75,000 tons of coal yearly for five years, and to pay therefor on the basis of all mining costs plus twenty cents a ton. The mining costs covered an expansive range. The contract was later extended for a ten-year period on the same basis except that the amount of coal to be purchased was reduced to 60,000 tons annually. J. R. Hamm testified that the contract was a very valuable one to any coal operator and that he knew of no other such coal contract in Iowa. Through purchases in the bankruptcy proceeding Mr. Hamm and Mr. Carpenter acquired one half the property and Mr. Bulmahn and H. R. Bechtel each received a fourth interest. At the time of the trial H. R. Bechtel and his wife, Marie, owned one half of the property and J. R. Hamm and wife owned one half. From 1931 to 1943 the Sunshine Coal Company paid dividends of $84,964.33 of which one half was paid on the stock

of the Bechtels, Lee and Bulmahn. Plaintiffs contend that dividends in the total amount of $154,482.16 were in fact the property of ISU and were fraudulently appropriated by the Bechtels, Lee and Bulmahn in breach of trust and their official obligations to ISU, and that the contracts for coal purchases were merely undercover arrangements in which Bechtels et al. were in fact the sellers and the buyers. There were other suspicious circumstances. Stock was held by some for others. J. R. Hamm sold 80 shares of the coal stock to the wife of H. R. Bechtel for $20 a share when it was worth $100 a share. The reason given was open to serious question. There were plausible inferences in support of the plaintiffs' contentions, but we find the evidence insufficient to establish this item of their claim.

Division 19—Secret salary account.

 In 1925 E. F. Bulmahn was vice-president, treasurer and general manager of the Iowa Southern Utilities Company. He was chosen president of the Company on February 19, 1934, and continued as president, treasurer and general manager until his death on May 19, 1937. Edward L. Shutts succeeded him as president and treasurer on June 8, 1937, and has held those offices continuously. Prior to that time he was the auditor and assistant secretary.

Beginning in 1925, Mr. Bulmahn began having monthly vouchers of ISU issued in his favor. The general ledger for 1924-25, as did subsequent ledgers, had an account entitled "Harris Trust Company of Chicago, Illinois." It was account No. 40-16 in this particular ledger, but in later ledgers it appears as No. 211.1-4 and also as No. 21.1-2. None of the Bulmahn vouchers was produced at the trial except for the months of January, February, March and April of 1937, just before his death. Checks payable to him were issued on these vouchers. The stub of an ISU check is stapled to the voucher for February 27, 1937, which has noted thereon the date, March 1, 1937, the amount, $1268.83, payable to E. F. Bulmahn, for draft purchased from The First National Bank of Centerville, Iowa. The check was probably used to purchase Chicago exchange. This voucher and many others have the initialed approval of Vaughn D. Welsh, who was assistant secretary and assistant auditor. The vouchers for March and April 1937 have the initialed approval of Edward

L. Shutts, who was auditor at that time. These vouchers all passed through the auditor's department. The remaining vouchers which have been certified to this court, and the latest one is for December 1943, were drawn in favor of Edward L. Shutts.

These vouchers or checks were debited to the Harris Trust Company Account, supra. Mr. Bulmahn deposited these checks or drafts to the credit of his private account in the Harris Trust & Savings Bank of Chicago. This bank account is spoken of in the record as the secret account, and also, perhaps more euphemistically, as the private pay roll account. Every officer and employee of ISU received his regular salary or wages through the *Company* pay roll department. They were paid twice a month and the name of the officer or employee and the amount of each check were recorded in the pay roll registers.

But the names of the beneficiaries of this private pay roll and the amounts they received therefrom were never so recorded in any of the books of the Company. Their names and the amounts they received for their regular salaries or wages, of course, appeared in the Company's pay roll registers. This private pay roll existed from 1925 until Mr. Bulmahn's death in 1937, and then it was continued by Mr. Shutts until March 4, 1944, when the last check was drawn. Deposits in and withdrawals from the account were made each month during that period. Mr. Shutts testified that he looked after the deposits and withdrawals while the account was in Mr. Bulmahn's name.

In 1925 the sum of $3125 was deposited and $3000.05 was withdrawn. Of this sum E. F. Bulmahn received $1750, H. W. Deininger, a district manager or a superintendent for ISU, received $833.35 and Mr. Shutts received $416.70. In 1926 $10,460 was deposited and $9450 was appropriated by the beneficiaries, as follows: Mr. Bulmahn, $6000, Mr. Deininger, $2000, Mr. Shutts, $1000, and D. D. Bentzinger, $450. These sums were over and above the regular salaries which these men received on the Company's regular pay roll, from which Mr. Bulmahn in 1926 took $9000, Mr. Deininger, $4000, Mr. Shutts, $4000, and Mr. Bentzinger, $4050. What was left remained as a balance in Mr. Bulmahn's bank account. According to Exhibit P2091, made by plaintiffs' expert accountant witness, and certified to be correct by Mr. Shutts, ISU furnished $223,370.14 to replenish this pri-

vate pay roll from 1925 to 1942, inclusive. This computation does not include $14,009.19 deposited in 1943 and $825 deposited January 4, 1944. Including them makes the aggregate deposits $238,204.33. All of this sum was not unlawfully appropriated. A bonus of $5000 was given Mr. Bulmahn on December 8, 1936, which for some reason he passed through the account. Also a balance in the account of $1400 was checked back to ISU by Mr. Shutts on March 4, 1944. There were also legitimate increases in salary given to each of the four beneficiaries of the account which were paid through this account. We have computed and deducted these increases only with respect to Mr. Shutts, since he is the only one of the beneficiaries who is a defendant in this suit. Mr. Bulmahn, Mr. Deininger, and Mr. Bentzinger have all passed away and their estates are not involved.

After Mr. Bulmahn's death, Mr. Shutts made the monthly deposits in his private account. He was not certain what became of any balance in this account on Mr. Bulmahn's death although he testified he gave a check to Mrs. Bulmahn of about $525. On December 20, 1940, Mr. Shutts separated this account from his private bank account, and thereafter the funds taken from ISU were deposited in an account designated "Edward L. Shutts Special Account."

The beneficiaries of this account, while it was in the name of Mr. Shutts, were Mr. Deininger, Mr. D. D. Bentzinger, Mr. Shutts, H. J. Prow, later auditor of the company, and Al Bentzinger, a brother of D. D. Bentzinger. We have the bank statements and the canceled checks which Mr. Shutts received from the Harris Trust & Savings Bank, from January 1941. These show that the monthly deposits were usually $1402.17 until the last few months when they were $848 and $825. In the monthly distribution as shown by these checks, Mr. Shutts retained $700, Mr. Deininger, $366.67, and D. D. Bentzinger, $287.50. In the last four or five months Mr. Shutts took $400 a month, and the other two took $200 a month. Mr. Prow was given $25 a month for a total of $825.

This was a completely secret account known only to those who had some part in it. Bulmahn and Shutts knew all about it. Whether any of the other beneficiaries knew what the others were receiving does not appear. There is no direction or au-

thorization in any record of the Company for this surreptitious and unlawful appropriation of the Company's funds. Shutts and Welsh so testified. Shutts testified that Bulmahn told him that he operated the account in the manner shown solely because the people of Centerville might think that the total compensation he was thus receiving was excessive because they would think his services were limited to Centerville and not extended over the entire territory served. Shutts testified his chief reason for continuing the account was because Bulmahn did so. This was the only reason he gave, other than that he acted under Bulmahn's orders. But for five years after Bulmahn's death he continued the account, during which time he deposited in it and withdrew by checks, all signed by him, over $100,000. Bulmahn kept his private bank account in Chicago. Shutts deposited the checks he received from it for a time in a Des Moines bank, and later in the Harris bank in Chicago. This was done so people in Centerville would not know about these checks. An exhibit of defendants shows that 201 preferred stockholders lived in Centerville.

No witness testified to any knowledge of this account except Shutts and Vaughn D. Welsh. The latter knew about it because he approved almost all the deposit vouchers while Shutts had the account. A few vouchers were approved by someone else, but the initialed monogram is indecipherable by this court. Mr. Welsh testified that he knew of the account and that some of the officers received part of their pay through it, but that he otherwise knew nothing about it. No other director, officer or person connected with the Company testified about it excepting Harold R. Bechtel and he said neither he nor his father had ever heard of the account. There is no evidence that he or his father received any money from the account. Edward de Rivera testified by deposition but said nothing about it. Geo. M. Bechtel and H. H. Polk were not witnesses.

Mr. Shutts was very unwilling and evasive in his testimony about the subject. Apparently plaintiffs and their attorneys did not learn about the matter until during the trial. Their accountant had access to the files and records of the Company but found nothing therein about the account, and the checks, vouchers and Harris bank statements were not shown to him. Mr. Shutts had

testified about the private pay roll book being kept locked in Mr. Bulmahn's desk and his own. He admitted having his canceled checks etc. He was executor of Bulmahn's estate and had seen his Harris bank statements and canceled checks, but said he had returned them to Mrs. Bulmahn. When asked on the witness stand if he would produce the various evidences of his account, each time he replied that the questions should be directed to his attorneys or to the court. His attorneys, Mr. Fowler and Robert Valentine, promptly stated that the evidence would be produced only on the orders of the court. An application for an order to produce was promptly made to the court, and over vigorous oral and paper resistance of defendants' attorneys the order was granted.

Mr. Shutts was asked by one of his attorneys if at Mr. Bulmahn's request, after the latter became president, he had not attended each meeting of the stockholders and directors and had with him a statement of the compensation each officer and manager received including the amount received from the private pay roll so that he might answer any inquiry made about any salary. He replied that this was true. On cross-examination he said one such inquiry was made but he could not recall who made it or when it was made. It was a senseless procedure, if done, since Mr. Bulmahn could have carried the statement in his pocket and have shown it to all inquirers. It is an incredible story, as the performance of the plan would have nullified all of the secrecy of both Mr. Bulmahn and Mr. Shutts respecting the account.

As Mr. Shutts testified, the Harris Trust Company account on the books of ISU was not a real account. It was just bookkeeping. ISU had no account with that bank. The deposit vouchers had to be shown on the books, and this account was used to clear the vouchers. They were charged to the account, and the amount of the checks drawn on the private accounts of Bulmahn and Shutts in the Harris bank were by journal entries credited and charged as items of expense to appropriate accounts, such as No. 230aa or 233aa, but the recipients of these checks were not designated by name in these accounts. Mr. Shutts and Mr. Welsh, as auditors, had the supervision of this bookkeeping.

All persons who participated in this scheme in any material

way were guilty of wrongful conduct. Some were more guilty than others perhaps. All were officers and Shutts and Bulmahn were also directors. Deininger was a vice-president, and he and D. D. Bentzinger had important positions in the administrative and operating departments. Mr. Shutts should perhaps be charged with all money he withdrew from ISU, although he kept only part of it. Plaintiffs charge him with what he personally received from the private pay roll from its inception, the principal of which amount they state to be $69,636.62. Our computation is less than that. It is true that he received that sum in that manner. But the board raised his salary twice and he ran these increases through the secret account. The salary of Shutts in 1925 was $4000 a year as auditor and assistant secretary, and it continued at that amount until 1931 when it was $3833.38. These payments were during the years of top dividends on both preferred and common stock. In 1932 all dividends stopped. They were never renewed on the old common stock. Much reduced dividends were paid on preferred stock from 1934 on.

In 1932 all salaries were horizontally reduced 10%. Shutts's salary became $3600 and Bulmahn's $9000 salary became $8100. The salaries which were reduced were the regular salaries as entered on the Company's pay roll registers. The secret salaries were never reduced. Their trend was ever upward.

From 1925 to 1936 during the Bulmahn regime, Shutts received a total of $20,345.01 from the private pay roll over and above his regular or proper salary. When he was made president on June 8, 1937, the minutes of the board do not mention what his salary was, but simply state that it was increased $2700. On April 15, 1940, the board by resolution again increased his salary —this time by $2000—so that with his pay roll register salary of $3600 enlarged by two increases he had an annual salary from 1940 on of $8300. But these increases did not cause Mr. Shutts to eliminate or decrease his annual take from the secret account. He took more from it. The following statement in the first two columns shows his legitimate salary as increased. The third

column shows what he took from the private pay roll. The fourth column shows the total amount he received.

| | Payroll Register | Rightful Salary | Secret Salary | Total |
|---|---|---|---|---|
| 1937 | $3600 | $5175.00 | $3699.96 | $ 8874.96 |
| 1938 | 3600 | 6300.00 | 3700.00 | 10,000.00 |
| 1939 | 3600 | 6300.00 | 3700.00 | 10,000.00 |
| 1940 | 3600 | 7633.33 | 3783.32 | 11,416.65 |
| 1941 | 3600 | 8300.00 | 3700.00 | 12,000.00 |
| 1942 | 3600 | 8300.00 | 3700.00 | 12,000.00 |
| 1943 | 5400 | 8300.00 | 3700.00 | 12,000.00 |
| 1944 January | | | 400.00 | |

The total of the secret salary column is $26,383.28 for this period, and with the amount of $20,345.01 received from 1925 to 1936, inclusive, makes the total amount received in excess of his authorized compensation the sum of $46,728.29. We find that judgment should be rendered against Edward L. Shutts for that amount with interest as the law provides.

With respect to this issue the trial court stated that while "this secret method of payment was unusual the court does not consider that it was necessarily fraudulent and believes the purpose thereof was sufficiently explained. * * * The evidence reflects that the directors and officers of the Company were fully informed with reference to the matter * * *. * * * the testimony of the defendants' witnesses is to the effect that the directors at all times knew of the amount being paid to all of the officers, directors and employees for their services. The amounts so paid are reflected on the books of the Company and no attempt was made to withhold information concerning the so-called secret additional compensation paid to the three employees and Bulmahn."

We have set out quite fully herein the pertinent facts bearing on this issue and we are satisfied that statement of facts in the quotation above lacks support in the record. The account was established and maintained in secrecy. The evidence was not disclosed to plaintiffs' accountant in his investigation of the books and records, and strenuous objection was made to their production in court. In compliance with some Federal regulation Mr. Bulmahn prepared and Mr. Shutts transmitted a statement to Washington of salaries of ISU officers. And in an amendment to Bulmahn's income tax return his salary, including a bonus of

$5000, and $6300 from the secret account, was given as $19,400, but these statements gave no notice to ISU. Neither did they mention "management fees."

The trial court stated that Mr. Shutts's average yearly salary including the secret payments during the period in question was $7488.33, which the court thought was not excessive for his services. He was a bookkeeper and an auditor. He at all times disclaimed any qualifications as to the values or operation of utility plants. His authorized salary until he became president was $4000 a year until it was cut by his company to $3600. The highest salary received by Mr. Welsh, who took over Mr. Shutts's job and duties when the latter became president, was $3960 a year, as shown by the resolution of the board. Mr. Shutts's average authorized annual salary from 1937 to 1943, inclusive, was $7186.90 and in addition from the secret account he took over $3700 each of those years on the side. Each year the board or the stockholders passed on the matter of officers salaries and several times fixed or increased them, but on other occasions they simply resolved that "all salaries shall remain as they are until changed by the Board." It was not the province of the trial court to pass upon the adequacy or the inadequacy of the salary of Mr. Shutts. That is a duty which the stockholders determine for themselves or delegate to the board. And when either has fixed the salary the courts ordinarily should not interfere. Mr. Shutts testified that he did not think that the directors knew of the separate account, but that they approved his salary. We have searched the records in vain for such approval. No director and no witness, other than Mr. Shutts, gave any testimony even tending to establish it. Geo. M. Bechtel, as president or as chairman of the board, presided at almost every meeting of the stockholders or of the board. H. R. Bechtel, as secretary, attended each of these meetings just as faithfully and wrote the minutes. If there had been any discussion about this matter they would likely have heard it. Both were defendants, and H. R. Bechtel was a witness for defendants and he testified that he never knew or heard of the private pay roll. These withdrawals of the funds of the Iowa Southern Utilities Company and their distribution by Mr. Bulmahn and Mr. Shutts to themselves and others were without right or without compliance with section 3 of Article

VI of the corporate by-laws which requires that "the salaries of all officers of the Corporation shall be fixed by the Board of Directors."

To recapitulate and for convenience of reference we set out our findings in the preceding Divisions:

| | | | |
|---|---|---|---|
| 1. Creston | $ 412,835.00 | 11. Bechtel Note | $ 580,759.15 |
| 2. Lamoni Elec. Co. | 100,000.00 | 12. Management Fees | 370,370.00 |
| 3. Ottumwa | 225,051.00 | 13. Common Stock Div. | 678,000.00 |
| 4. Burlington Ry. & L. Co. | 363,833.79 | 14. Stock Commissions | 115,720.00 |
| 5. Albia L. & Ry. Co. | 395,000.00 | 15. Bond Commissions | 100,000.00 |
| 6. Burlington Gas Light Co. | 118,868.14 | | |
| 7. Murray (Town of) | 2,000.00 | | $1,844,849.15 |
| 8. Peoples L. & F. Co., Grinnell | 121,268.85 | | |
| 9. Iowa L. H. & P. Co., Grinnell | 37,500.00 | | |
| 10. Iowa G. & E. Co., Washington | 435,292.90 | | $2,211,649.68 |
| Total | $2,211,649.68 | Grand Total | $4,056,498.83 |

The amount we find against Edward L. Shutts, individually, for the principal amount which he received from the secret pay roll bank account is $46,728.29. The total amount for which the plaintiffs asked recovery on all items was $5,279,144.43. The total loss which the district court found the Iowa Southern Utilities Company had sustained was $3,210,292.70.

Geo. M. Bechtel began his business career as a dealer in Iowa municipal bonds. He said that in reality he was never anything else, but he was forced into the public-utility business and did the best he could at it. The municipal bond business had slackened and he acquired all of the common stock and a considerable block of the preferred stock of the Iowa Southern Utilities Company of Maine, and converted it into a Delaware corporation of the same name. To aid in the issue of mortgage bond indebtedness he provided for mortgages less restricted than that of the old Maine corporation. He had placed in the new certificate of incorporation Article XI, which is set out herein. He wished to continue to operate under his trade name of Geo. M. Bechtel &

Co. and to have unlimited transactions with the new corporation, which he controlled as effectively as he controlled himself, as though the two were strangers and dealing at arm's length. Article XI gives the cue to his purpose and plan, and the alacrity with which he took advantage of it with his Creston and later transactions definitely confirms and makes evident his plan and purpose. He knew that since he owned all the common stock he could name his own directors and officers and that they would do his bidding. And so he simplified or rather eliminated meet-' ings of the board of directors by section 5 of Article V of the by-laws. That this method of sending about among the directors minutes of meetings that were never held or discussed would be pregnant with and potential of danger is apparent on its face. The following letter of Mr. Shutts, the auditor, to H. R. Bechtel, dated *September 6, 1927*, following up a similar letter of *August 23, 1927*, showing the loose and careless manner of preparing and preserving minutes is illustrative of others, to wit:

"Have you been able to locate the Minutes of the meeting of the Board * * * of May 24, 1927, authorizing the payment of Preferred and Common stock dividends July 1, 1927, and the issue of that 1000 shares of preferred stock? Also the Minutes of the Annual Meetings of the stockholders and the Board of Directors of February 21, 1927? If you are not going to be able to locate these Minutes perhaps we had best proceed to write up new Minutes for the signature of the Officers and Directors."

One who operates his private business honestly, ordinarily has no objection to the inspection of his books by one who is backing him in the business financially. The same is true of a partnership if a silent partner asks the same privilege. The officers and directors of a corporation are agents and trustees or quasi trustees for the corporation and its stockholders. The latter are in fact the owners of the corporation and its property. And a corporation and its promoters, officers and directors, if they operate the institution honestly, or intend to, should have no objection to a stockholder of the company inspecting its books and records at reasonable times, but paragraph (f) of Article X of the Certificate of Incorporation, and Article XIII of the by-laws gave the board the right to deny such inspection. Mr.

Shutts testified that it was the policy of the board to refuse such inspections or examinations by a stockholder.

Geo. M. Bechtel and J. Ross Lee were the controlling forces in Geo. M. Bechtel & Co. at the time ISU was incorporated. H. R. Bechtel was also active and assuming responsibilities. Mr. Shutts and Mr. Bulmahn came over to the Delaware corporation from the Maine corporation. These men at once also became active in the operation of the new corporation. It is our finding that at and before the incorporation of ISU it was the intention and purpose of the Bechtels, and of Lee and Bulmahn to operate the Bechtel company and ISU and to transact the business just as this record shows it was thereafter done—in other words, that the Iowa Southern Utilities Company was to be operated primarily and chiefly for the benefit of the Bechtels and their associates. We also find that the other dummy directors and Mr. Shutts gave aid in accomplishing this purpose and plan.

The different appellees in their arguments discuss only briefly the items on which plaintiffs seek recovery, and have confined their arguments substantially to the issues of laches and the statute of limitations. They disregard as of no practical importance or consideration the monetary variances between the opposing parties or with respect to the findings of the trial court on the different claims for recovery, because of the purported financial inadequacy of the defendants, singly or collectively, to pay the amounts claimed, or for which judgment may be rendered.

The ability of the defendants to pay or the collectibility of a judgment rendered is not of controlling consideration with this court. Counsel for appellees suggest to this court that the trial court's findings, conclusions and decree will give this court a clearer and more complete statement and history of the case and the questions involved than can be gleaned from laboriously reading the pleadings and the briefs to ascertain the facts. We have read several times everything the able trial court has said and it has been very helpful. No one appreciates more fully than we the long time and great diligence and energy he has expended. But this case is tried anew in this court, on both the facts and the applicable law and we know of no satisfactory substitute for

laborious personal research and study to ascertain and evaluate either.

It is our conclusion that the principles of law involved herein are quite well-settled, and that the facts on the numerous issues presented largely control our determination of each. It is for that reason that we have felt compelled to set out at some length and particularity the pertinent material facts.

There are some principles of law applicable to all or several of the claims, contentions or issues discussed in the preceding Divisions concerning which the parties, in general, have little, if any, disagreement. For that reason and because the defendants have not stressed these issues in argument our statements of propositions of law and citation of authorities will be limited.

I. As we have noted, the promoters, officers and directors of a corporation are the agents of and act for it, and indirectly for its stockholders, and they are the trustees or quasi trustees, at least, of the property of the corporation for the company and its stockholders. They occupy a fiduciary relation to the corporation on which relation the stockholders may rely. The corporate entity and the stockholders, in particular, may presume that these trustees will perform their duties with the diligence, honesty and the utmost good faith, inherent and implicit in their functions. They are not required to be ever on their guard and watchful lest those trustees misapply, destroy, embezzle, steal the corporate assets, or defraud them. Corporate directors and officers may under proper circumstances transact business with the corporation including the purchase or sale of property, but it must be done in the strictest good faith and with full disclosure of the facts to, and the consent of, all concerned. And the burden is upon them to establish their good faith, honesty and fairness. Such transactions are scanned by the courts with skepticism and the closest scrutiny, and may be nullified on slight grounds. It is the policy of the courts to put such fiduciaries beyond the reach of temptation and the enticement of illicit profit. These principles are founded on the soundest morality and have received the clearest recognition in all courts. We note some of the many authorities announcing those principles: Caffee v. Berkley, 141 Iowa 344, 347, 348, 118 N.W. 267; State v. Exline Fuel Co., 224 Iowa 466, 470, 471–473, 276

1082

N.W. 41; Hoyt v. Hampe, 206 Iowa 206, 208, 220, 221, 223, 214 N.W. 718, 220 N.W. 45; Dawson v. National Life Ins. Co., 176 Iowa 362, 374, 375, 378, 379, 381–383, 157 N.W. 929, L. R. A. 1916E 878, Ann. Cas. 1918B 230; Clapp v. Wallace, 221 Iowa 672, 676, 677, 266 N.W. 493; Gobel, Inc. v. Skipworth, 232 Iowa 382, 388, 3 N.W.2d 551; In re Estate of Holley, 211 Iowa 77, 81–83, 232 N.W. 807; First National Bank v. Fireproof Storage Bldg. Co., 199 Iowa 1285, 1295, 202 N.W. 14; Wabash Ry. Co. v. Iowa & S.W. Ry. Co., 200 Iowa 384, 392, 393, 202 N.W. 595; Hallam v. Indianola Hotel Co., 56 Iowa 178, 180, 9 N.W. 111; Toledo Sav. Bk. v. Johnston, 94 Iowa 212, 217, 218, 62 N.W. 748; Hinkley v. Sac Oil & Pipe Line Co., 132 Iowa 396, 403, 404, 107 N.W. 629, 119 Am. St. Rep. 564; The Telegraph v. Loetscher, 127 Iowa 383, 390, 101 N.W. 773, 4 Ann. Cas. 667; Ramsey v. Welch Co., 163 Iowa 324, 328, 329, 144 N.W. 323; Linsley v. Strang, 149 Iowa 690, 694, 696, 126 N.W. 941, 128 N.W. 932; Geddes v. Anaconda Copper Mining Co., 254 U. S. 590, 41 S. Ct. 209, 212, 65 L. Ed. 425; 13 Am. Jur., Corporations, section 997 et seq.; Loft v. Guth, 23 Del. Ch. 138, 2 A.2d 225, 235.

 The defendants are liable for turning the utility properties to the corporation at excessive and fraudulent prices. 1 Fletcher, Cyclopedia Corporations, Perm. Ed., sections 135, 148, 198. All persons conspiring or co-operating with or aiding and abetting the officers or directors of a corporation in defrauding the corporations are equally liable with them. 1 Fletcher, supra, sections 194–198; Gobel, Inc. v. Skipworth, supra, 232 Iowa 382, 388.

 Conspiracy may be established by circumstantial evidence and may be inferred from concert of action, declarations and conduct. Hanson v. Kline, 136 Iowa 101, 110, 113 N.W. 504; Reinertson v. Struthers, 201 Iowa 1186, 1194, 207 N.W. 247; Shannon v. Gaar, 233 Iowa 38, 44, 6 N.W.2d 304. One who knowingly and intentionally participates in effecting a fraud is liable even though he did not share in the fruits of the wrongdoing. Hanson v. Kline, supra, 136 Iowa 101, 110.

 Where a person has control of a corporation, however it may be effected, he will be held to the most rigid good faith

in any transaction with the corporation or its property. Price v. Holcomb, 89 Iowa 123, 138, 56 N.W. 407.

II. This proceeding in equity, commonly called a stockholder's suit or derivative action, is one brought by one or more stockholders of a corporation in their name as plaintiffs, but as representatives of the corporation and for its benefit. They are plaintiffs in name only, and though the corporation is made a defendant it is the real plaintiff in interest, and the beneficiary of any judgment recovered. Its basis is a damage done to the corporation by the real defendants and the refusal or failure of the corporation to redress the wrongdoing. It must be brought in equity. The English courts in Foss v. Harbottle, 1843, 2 Hare 461 recognized the jurisdiction of equity in such suits. The Supreme Court of the United States in Dodge v. Woolsey, 1855, 18 How. (U. S.) 331, 15 L. Ed. 401, held that the jurisdiction of equity in this class of suits "is now no longer doubted." See also Hawes v. City of Oakland, 104 U. S. 450, 26 L. Ed. 827. As a rule a demand must be made upon the proper corporate officers to bring the action before one can be prosecuted by stockholders. But if such demand would be a vain and useless thing no demand is necessary, but the petition should state the reasons. It is an almost necessary consequence of a wrong to the corporation, such as the embezzlement of funds or the wrongful appropriation of property, that the value of each stockholder's interest will be impaired. Defendants do not challenge the procedure. Litigation of this kind has frequently been before this court. See Troutman v. Council Bluffs Street Fair etc., 142 Iowa 140, 145, 120 N.W. 730; Dillon v. Lee, 110 Iowa 156, 162, 163, 81 N.W. 245; Kennedy v. Citizens Nat. Bk., 128 Iowa 561, 104 N.W. 1021; Schoening v. Schwenk, 112 Iowa 733, 84 N.W. 916; Graham v. Dubuque Specialty Mach. Wks., 138 Iowa 456, 460–463, 114 N.W. 619, 15 L. R. A., N. S., 729; Reed v. Hollingsworth, 157 Iowa 94, 106, 107, 135 N.W. 37; The Telegraph v. Lee, 125 Iowa 17, 20, 98 N.W. 364; Outing v. Plum, 212 Iowa 1169, 1171–1173, 235 N.W. 559; Ballentine on Corporations, chapter XI, sections 143 to 157a, inc.; 13 Fletcher, Cyclopedia Corporations, Perm. Ed., XXXIII, sections 5939–6045.

Shareholders' actions are provided for by rule 44 of the Iowa Rules of Civil Procedure.

III. In its answer to plaintiffs' petition as amended, the Iowa Southern Utilities Company alleged that with respect to the representative nature of the suit, since it was in behalf of the corporation, it neither affirmed nor denied the allegations. It did allege, in its answer, that the acts complained of were done more than five years before the commencement of this suit, and that plaintiff stockholders and others in whose behalf the suit was brought are estopped by their laches and acquiescence from asserting the invalidity of the amendment to the Company's Certificate of Incorporation which was adopted on or about August 1, 1938, in making effective the plan for the reclassification of the capital stock of the corporation. It was the contention of defendants that the issue of the validity of said amendment was adjudicated in State ex rel. Weede v. Bechtel, 239 Iowa 1298, 31 N.W.2d 853, 8 A.L.R.2d 1162, supra. In that case both sides appealed and this court affirmed the judgment of Judge Graven on both appeals. The decision in that case did not involve any of the issues that are before us in this appeal. The judgment in that case upheld the reclassification of the capital stock with one important exception. The nature of the reclassification is set out in the opinions of this court in the two Weede cases in 231 Iowa 784, and 239 Iowa 1298, supra, and we will discuss but one part thereof here. The exception just mentioned had to do with the new common stock which the reclassification gave for the 100,000 shares of the old common stock held by the Bechtels or their assignees. As of August 1, 1938, the shares of outstanding preferred stock of all classes numbered 80,102, of a par value of $8,010,200, which, with the common stock of a book value of $1,000,000, made the total capital $9,010,200, as carried on the books. The market value of the preferred stock was below par, and the common stock had no market value and no value on the basis of the balance sheets, earnings or surplus. The preferred stock carried with it accumulated dividends of $2,439,335, all of which had priority over the common stock. In the recapitalization all outstanding shares of capital stock were reclassified to 358,799.1 shares of stock of one class—new common stock—of a par value of $15 a share, of which the old preferred stockholders were entitled to 319,331.1, and the old common stock then held by Martha R. Bechtel was entitled to 39,468

shares. This reclassification reduced the capital to $5,381,986.50 which made a capital surplus of $3,628,213.50. At this special meeting of the board of directors, at which Geo. M. Bechtel, chairman of the board, presided, and H. R. Bechtel was the secretary, and all other directors (Dawson Brande, H. H. Polk, Edward de Rivera, and Edward L. Shutts, president) were present, this capital surplus was disposed of as follows: (1) to increase the company's retirement reserve by $1,000,000; (2) to charge off preferred stock commissions and expenses in the amount of $125,786.14; and (3) to reduce intangible assets by $2,502,427.36 —so that at this meeting on August 1, 1938, the board charged off against this surplus and declared worthless so-called assets of $3,628,213.50. As of that date the total book value of the Company's assets was $26,969,833.35. Deducting therefrom the assets charged off of $3,628,213.50 left assets of the book value of $23,341,619.85. The total liabilities of the Company on August 1, 1938, were $27,062,612.35 or $3,720,992.50 greater than the total assets, after the writing off of said worthless property. The capital obligations were, of course, reduced after the recapitalization.

Of the 319,331.1 shares assigned to the holders of the old preferred stock 51,254.4 shares represented the accumulated preferred stock dividends, for which certificates were to be issued in substitution for 12,927 shares of old preferred stock upon the surrender of the certificates therefor.

Judge Graven in his decree in the last Weede case held that the 39,468 shares of new common stock which were issued for the old Bechtel common stock in the reclassification were void. This court affirmed the decree. Judge Graven said: "The court finds that the said reclassification as to the issuance of 39,468 shares issued to Martha R. Bechtel * * * was unjust and unfair and inequitable as to the former preferred stockholders represented in this case by the intervenors, Ila Faye Thatcher and Nancy Rousseau [plaintiffs in the case before us]. * * * That the no-par common stock for which the new common stock was issued, was worthless, and that there was no consideration for the issuance of the said 39,468 shares of new common stock." We quoted this language in the opinion in 239 Iowa 1298 at 1311. The par value of the new common stock which the court canceled

was $592,020. The resolution of the board which awarded those 39,468 shares of stock was carried unanimously by the vote of every director including Brande, deRivera, Polk and Shutts, whom defendants insist were "independent" directors. By joining up with Geo. M. Bechtel and Harold R. Bechtel they gave them stock of a par value of $592,020 in exchange for stock which Judge Graven and this court held was worthless.

Mr. Shutts was the president of the Company at that time and has been ever since. This suit is for the benefit of the Company. It has filed a brief and argument in this case but no sentence is contained therein in behalf of the Company.

■■■■ IV. All individual defendants affirmatively pleaded the defense of the Statute of Limitations and of laches against any recovery by the plaintiffs. The burden is upon them to establish those defenses if any judgment for recovery is to be denied. Section 614.1, subsection 5, of the Codes of 1946 and 1950 (section 11007, subsection 5, of the Code of 1939) provides: "Actions may be brought within the times herein limited, respectively, after their causes accrue, and not afterwards, except when otherwise specially declared: * * * 5. Those founded on unwritten contracts, those brought for injuries to property, or for relief on the ground of fraud in cases heretofore solely cognizable in a court of chancery, and all other actions not otherwise provided for in this respect, within five years * * *."

Section 614.4, Codes of 1946 and 1950 (section 11010, Code 1939) provides: "In actions for relief on the ground of fraud * * * the cause of action shall not be deemed to have accrued until the fraud * * * complained of shall have been discovered by the party aggrieved."

■■■■ This suit being a derivative one brought for and on behalf of the corporation must be considered as a suit brought by the corporation. There is no evidence that any plaintiff had any knowledge or notice of the frauds complained of. A large number of them so testified. But since the fraud charged is against the corporation, and only as a result thereof against the plaintiff stockholders, any discovery thereof must be by the corporation, and any notice of fraud must be to the corporation. Of course, any knowledge of the fraud by, or notice thereof to, an officer or director who conceived the fraud, or who participated

therein, could not be called knowledge, notice or discovery, of the fraud on the part of the corporation. Knowledge of the fraud by Geo. M. Bechtel, J. Ross Lee, Harold R. Bechtel, or to any person participating therein who was in a fiduciary relation to the corporation, or owed a duty to protect it, would not be knowledge or notice to the Iowa Southern Utilities Co.

The defendants contend that the Company had knowledge of the frauds through notice thereof to directors Shutts, de-Rivera, Polk and Brande. These men they assert were not connected with the Company when the frauds were committed and in no way participated therein. This may be stating it too broadly but we will make the distinctions when we discuss the individuals separately. The question of notice varies with the claims, and their nature.

We will consider first the ten claims in the first ten Divisions which we have hereinbefore set out in recapitulation with the amount of each and the total amount. These are the claims which are based on the inflated prices for which the Company accounted to Geo. M. Bechtel & Co. They aggregate the sum of $2,211,-649.68.

The purported notice came about in this way. Dividends on all stock were not paid in 1932 and 1933, and the Company was unable to refund the Burlington Railway & Light Co. bonds which it had assumed, and had to procure extensions at 8% annual interest. The company was desirous of issuing a large amount of its own bonds. The Securities Act of 1933 had been enacted by Congress and it was necessary that such bond issues should be approved by the Securities and Exchange Commission at Washington. Seibert & Riggs of New York City, attorneys for W. C. Langley & Company of that city, and Arthur Andersen & Company of Chicago were aiding in trying to satisfy the commission, in complying with a questionnaire or registration statement. Inquiry 45 thereof was entitled "Historical Financial Information." Someone connected with the above named firms prepared a letter which was sent to Geo. M. Bechtel for his signature. H. R. Bechtel testified that the letter was either sent out completed by Parker K. Deane, an associate or partner in Seibert & Riggs, or the matters desired to be put in the letter

were specified. The letter as completed and signed was on a letterhead of the First Trust and Savings Bank, and is as follows:

"First Trust and Savings Bank
Complete Trust and Banking Services
Davenport, Iowa
GEO. M. BECHTEL, President

January 30, 1937.

Iowa Southern Utilities Company of Delaware,
Centerville, Iowa.
Gentlemen:

In 1933, in connection with a proposed registration statement of Iowa Southern Utilities Company of Delaware, certain information was compiled from the books of George M. Bechtel & Co. by Arthur Andersen & Co., independent accountants representing Iowa Southern Utilities Company of Delaware. Inasmuch as this proposed registration was not consummated, the independent accountants did not complete their work relating to George M. Bechtel & Co., and it is to be understood that the information contained in their working papers is tentative and incomplete in some respects; moreover, it has not been verified by representatives of George M. Bechtel & Co. The working papers referred to above have been made available for purposes of your present registration statement. It appears from such information as is contained therein that the cost to George M. Bechtel & Co. of the investments and properties sold to Iowa Southern Utilities Company of Delaware during the period from 1923 to 1931, inclusive, was approximately $12,100,000. It appears further that this amount is approximately $1,900,000 less than the aggregate consideration (including therein the principal amount, par value, or value assigned by the Registrant to securities issued or assumed) for such investments and properties which were so sold by George M. Bechtel & Co. to Iowa Southern Utilities Company of Delaware.

*The books of account of George M. Bechtel & Co. (a copartnership, terminated in 1933, of which I was a partner) from which the information contained in the working papers referred to above was obtained, are not now in our possession, in certain instances, and it is impracticable to attempt a recheck of these data at this time. However, with respect to the difference of $1,900,000 referred to above, I wish to state that, to the best of my knowledge and belief, this amount was largely absorbed by (1) the losses and costs incurred in marketing the securities received by George M. Bechtel & Co. from Iowa Southern Utilities Company of Delaware in payment for the investments and properties purchased by the latter company or in payment of the obligations arising from such purchases and (2) reasonable charges for services and expenses incurred in acquiring these investments and properties.*

Very truly yours,
George M. Bechtel"

c.c.
Arthur Andersen & Co." (Italics are ours.)

The body of the letter was incorporated in the registration statement at inquiry 45. Because of a poor bond market this registration statement was never filed. But, Parker K. Deane testified by deposition that he sent a copy of the statement to each director of ISU but had no acknowledgment of its receipt from either Mr. Polk or Mr. Brande. Two or more similar registration statements were later prepared but were not filed, and there was no testimony that they were sent to the directors. There was one registration statement prepared and filed with the commission on or about May 1940. The letter was not set out in this statement, and was referred to only as follows: "During the years 1923 to 1931, inclusive, the registrant acquired certain investments and properties and other net assets of various predecessors in title from an interest then affiliated with the registrant at an aggregate cost which, according to the most reliable information now available, was approximately $1,900,000 . in excess of the cost of such investments, properties, etc. to the affiliated interest. * * * Registrant states that the books of the predecessors in title to the properties acquired were available only for the Iowa Southern Utilities Company (a Maine corporation), Southern Iowa Electric Company, Iowa Gas & Electric Company, and Burlington Gas Light Company." A copy of this last statement bears the printed signatures of Geo. M. Bechtel, Harold R. Bechtel, Dawson Brande, H. H. Polk and Edward L. Shutts, as of May 3, 1940. This copy has 67 full pages of closely printed small type. It is 8½ inches wide and 13 inches long. These statements contain no information about the other six claims involved in this action, and any notice or information in them bears only upon claims among those in the first ten Divisions of this opinion.

Plaintiffs contend that the letter set out herein and the registration statement were not notice to the Company for two reasons, first, that the information contained therein is inadequate in both quantity and quality to inform the directors mentioned or any persons seeing it that there was any substantial excess of prices to ISU, or any profit to Geo. M. Bechtel & Co. in any material amount, and that, in fact, the letter gave information to the contrary; second, that these directors were not in fact independent, unbiased, or disposed to seek recovery from Geo. M.

1090

Bechtel & Co. or from its partners or those associated with it of any damages or property on behalf of the Company.

 Directing attention to the first contention. We think it has sound and substantial merit. The second paragraph of the letter fully neutralized and nullified the first paragraph. If there was poison administered against recovery on those ten claims in plaintiffs' petition in the first paragraph, there was a lifesaving antidote given in the second paragraph. Reading all of that letter within its four corners would convey no information and carry no conviction to any person of ordinary and reasonable prudence and conscientious regard for the rights of others that would justify his bringing action or having the Company bring action against the Bechtels. Even the first paragraph of the letter did not give facts sufficiently full or definite, or where they might be obtained, to warrant any action. There is no evidence that Shutts, Brande, Polk or deRivera ever mentioned the matter to George or Harold Bechtel or J. Ross Lee with the thought that they were liable to the Iowa Southern for wrongful taking of its assets. These six members of the Company conducted their official and corporate duties in complete harmony for ten years, except for Dawson Brande who died October 6, 1940, and except for Mr. Shutts who was not a director until 1937. Most of their board meetings were held at the Union League Club of Chicago, through the courtesy of the Bechtels who were members of the club. That same board of directors, annually through those ten years, chose Geo. M. Bechtel as chairman of the board and Harold R. Bechtel as secretary and assistant treasurer, each at an annual salary of $6250. There would hardly have been such agreement and cordiality with the Bechtels had not Mr. Brande et al. believed the second paragraph of the letter, and conducted themselves accordingly. None of the defendants, particularly George and Harold Bechtel, can consistently urge that there is no merit to plaintiffs' claim that these properties were turned to ISU at excessively inflated prices, and also urge that the Bechtel letter was notice to Brande, deRivera, Polk and Shutts, and thereby to the Company, that these properties were delivered to ISU at a profit to the Bechtel company of $1,900,000.

 Parker K. Deane, a member of a prominent law firm,

was asked: "But as an experienced lawyer, just from that letter there, defendants Exhibit 1, you had not arrived at the conclusion that on account of the contents of that letter, some action should be commenced on behalf of the Iowa Southern Utilities Company?" His answer was: "I had not." He was a member of the law firm of Seibert & Riggs, who were then acting for Iowa Southern Utilities Co., and had been consulted by them in the past, and in whose office ISU board meetings were sometimes held. Deane testified that he was acquainted with Mr. Polk and Mr. Brande and knew both were laymen and not lawyers, and that he never suggested to either of them that there was some basis for a lawsuit against the Bechtels or told either of them to commence an action against them for ISU, based on the contents of the letter. He also testified that he received no acknowledgment from any member of the board to his letters enclosing to them the registration statement of 1937, and that said statement was never before any meeting of the board of directors. The notice to an officer or director to be sufficient to give notice or knowledge to the corporation must be of and by facts of such full and definite character as to reasonably inform and warn such officer or director of the wrongful act against the corporation. No mere rumor or vague statement is sufficient.

Even in the meeting of the board on August 1, 1938, hereinbefore referred to, with all directors present, in the minutes of which meeting the aforesaid Geo. M. Bechtel letter of January 30, 1937 is set out, it is referred to with no definite conviction of the accuracy and verity of its statement that the properties were turned into the Company at prices approximately $1,900,000 in excess of their cost. For the resolution stated: "WHEREAS, it appears appropriate, *although not mandatory*, to eliminate from the Company's books the $1,900,000 excess (e.g. difference between the price at which the properties were placed on the Company's books and the cost thereof *to the Company's principal stockholder) notwithstanding the statement (contained in the letter previously quoted) that this excess was largely appropriated and utilized for assembling the property, for distribution of the Company's securities, and generally for the benefit of the Company.*" (Italics are ours.)

With the letter under consideration of the entire board with

the Bechtels there participating and no doubt contending, as stated in the letter, that the excess was largely absorbed for the benefit of the Company, the board apparently acquiesced therein. Certainly it did not express itself to the contrary, nor did it indicate any thought or intention of the Company to institute any court proceeding against the Bechtels. The minutes of the meeting may be fairly construed as showing either that the Bechtels dominated the board, or the board believed the contention of the Bechtels and the statements in the second paragraph of the letter. It is our conclusion and finding that the first contention of the plaintiffs that the letter on its face, reasonably and fairly construed, could not, in reason, and did not, in fact, cause any director who read it to conclude on the information it contained that Geo. M. Bechtel & Co. and associates had wrongfully appropriated $1,900,000 of the Company's assets. It may be noted here that H. R. Bechtel testified that he was astounded when he read the letter or its proposed contents, and the greatly exaggerated figure of $1,900,000. No other director was asked about the letter or the statement. There is no direct evidence that Brande or Polk read either one. Something was said about deRivera having something to do with preparing one of the statements. But, regardless of who may have read them it would not have the effect contended for by defendants. That being our conclusion a discussion of the plaintiffs' second contention challenging the purported independence of said directors might well be passed. We will refer to it briefly.

There is basis for plaintiffs' position. It was the testimony of H. R. Bechtel that his father, Lee, Bulmahn, himself, Payne and Nyemaster all worked and consulted together in the investigation of these properties, their acquisition and their delivery to ISU. They determined the acquisition prices and the prices at which they would be turned over to ISU. He did not testify that Mr. Shutts participated in these matters. But Mr. Shutts's testimony and the record generally establishes, without serious question, quite fully his connection with all matters involved in this suit. He became connected with the Maine corporation as early as 1917, so that he grew up with the Company. The minute book of the Maine company shows that as its assistant secretary he wrote the minutes of the meeting of February

2, 1922, at which the Newton property was acquired. He later became assistant secretary of the Delaware company and took an oath to faithfully perform the duties of that office. Later he was chosen as its auditor and continued as such officer until he became its president in June 1937. He testified that he went to Burlington about August 1, 1924, after the Walsh-Bechtel contract of sale in July preceding, and was there much of the time until January 1, 1925, when ISU took over the property. Leopold testified that Shutts learned the purchase price stated in the contract at that time. Previous to that, about April 1922 he went to Creston and set up some accounts in connection with that company's bookkeeping before it was turned over to ISU. Yet he testified he never saw the assets ledger of that company. He admitted that he examined the Day & Zimmerman appraisal of its plant, equipment and assets. When the Washington property was taken over and was being operated under the supervision of ISU he examined its books and made a balance sheet as of August 31, and prepared a statement of its earnings. He also saw the Day & Zimmerman appraisals of that property, and the book values of the property as set up in that company's books. As president of ISU and as director he joined with Brande, deRivera, Polk and the Bechtels in exchanging the worthless old common stock of the Bechtels for 39,468 shares of the $15-par new common stock. When the Ottumwa property was bought he went there and checked the current assets which the vendee should pay for in addition to the $3,000,000. He drew unauthorized checks on the side from the secret account in the Harris Trust & Savings Bank every month from January 1925 to January 1944. The defendants picture him as just a keeper of the records, who did just as he was told, and knew nothing about public-utility property values, and assumed no responsibilities in connection with his duties in the company for thirty years or more. He supervised the making of all checks for dividends, salaries and "Management Fees."

He testified of his years of work for the Company, and said: "I certainly knew something about its business." Yet, notwithstanding his long and intimate connection with ISU and Geo. M. Bechtel & Co., he testified that he had no knowledge of the cost of any of the properties in their acquisition by Geo. M.

Bechtel & Co. until he saw the Bechtel letter of January 30, 1937. When asked if he ever talked to either of the Bechtels about any wrongdoing on the part of either in connection with the Company, he answered, "Why should I? I never knew of any wrongdoing." To one of such frame of mind the letter would raise no suspicion against the Bechtels or J. Ross Lee. His disposition was such, and his knowledge of the unearned management fees, of the payment of common stock dividends when there was in fact no earned surplus for their payment, the unlawful taking of commissions and discounts, his handling of the secret account for Bulmahn and his unlawful participation therein for eighteen years would not incline him to the stirring up of any litigation against the Bechtels or their associates, by the Company or any stockholder. There can be no question that Mr. Shutts was neither independent nor unbiased with respect to Geo. M. Bechtel & Co.

Mr. deRivera, Mr. Brande and Mr. Polk were each first named as directors by a board that was a Bechtel board. Geo. M. Bechtel wished to keep complete control of the board and made his appointments with that in mind. Edward de Rivera became a partner in W. C. Langley & Co. in 1926. He, in particular, and a Mr. Watts performed liaison services for the Langley company in its relations with Geo. M. Bechtel & Co. In 1924 they personally inspected the plants and equipment and the books and records of the latter. One or more times a year until 1943 he came to Centerville. The relations of the Bechtels and the Langley companies were very close and very profitable to the latter, and probably to the first named, but at the ultimate cost to ISU. Langley & Co. largely dominated the handling of ISU securities outside of Iowa. It had priority and preference in such matters by reason of agreements. There are letters in the record from the Bechtel partners and Mr. Lee that they would consult with Langley & Co. before making business commitments. Concerning the Burlington Ry. & L. Co. transaction, on April 30, 1924, Mr. Lee wrote Langley & Co.: "We have at hand your letter of the 28th and be assured we will keep you fully advised of the latest developments. * * * All details will be submitted to you before any action is taken." There are letters between the Bechtel company and ISU advising against doing anything con-

trary to the advice and viewpoint of the Langley company, which were communicated by the Bechtels with pressure that they be followed. The Langley company and its clients held very substantial quantities of ISU securities. It received regular reports and balance sheets from ISU. When the preferred dividends stopped, deRivera was sent to Iowa to be made a director and it was done. The annual stockholders meeting of ISU was held at Centerville in 1943 on April 19. It was on this day that the original notices in this action were placed in the hands of the sheriff. The annual directors meeting was set for 4 p.m. immediately following the stockholders meeting. Mr. deRivera was informed of the notices, by whom he said he did not recall. Whether it was after he reached Iowa or before he entered is in dispute. But the directors met at 4 p.m., with Geo. M. Bechtel presiding, H. R. Bechtel, secretary, and president and director, Mr. Shutts, present. The meeting was immediately adjourned to meet at 10 a.m. the next morning, April 20, 1943, at the Fort Armstrong Hotel in Rock Island, Illinois, where the directors named above met with Mr. deRivera. Defendants took his deposition in New York City. He deposed that he had studiously avoided Iowa since the occasion in 1943, in order to avoid service of any action upon him. He was later made defendant in actions in Chicago and New York. The agreement between Bechtel & Co. and Langley & Co. that the latter would "kick back" to the first named any amount over 90 for stock sold by them—stock which had been delivered to them at 78—indicates a state of mind in each participant which wholly disregarded the fiduciary honesty and loyalty which the Bechtels and Lee, as officers and directors of ISU, owed to that corporation. It is our conclusion, that because of the matters herein related, notice to deRivera of the contents of the Bechtel letter would not, in law or in fact, be notice to ISU of any wrongdoing of Bechtel & Co. in the acquisition by the latter of said properties, or their delivery to ISU. Mr. deRivera at no time owned any stock in ISU prior to the reclassification of its capital.

H. H. Polk was engaged in the handling of bonds and other investments in Des Moines. He became a director through Geo. M. Bechtel. He owned no stock in the Company when he first became a director. Later he acquired a few shares of preferred

stock from time to time, which he would hold for a while and then sell them. He was an experienced investor and no doubt purchased the stock at a low price. There is evidence in the record that in the week of June 30, 1933, the first-mortgage $5\frac{1}{2}\%$ bonds of ISU due in 1950 were selling at $54\frac{1}{2}$ to $56\frac{1}{2}$. In January 1933 they were at approximately 54. In the week of June 24, 1933, the 7% preferred stock of ISU was selling at $14 to $16 a share; the $6\frac{1}{2}\%$ preferred at $11 to $12 a share; and the 6% preferred stock at $10 to $11 a share, although these stocks had a nominal claim against the Company for unpaid dividends for about fifteen months. We mention this to indicate his investment in ISU was very light, and his relations with the Bechtels were such that he would very likely accept as the truth the last paragraph of the Bechtel letter. He resigned as director in 1942. Mr. Brande seemed to think that Mr. Polk's relations with the Bechtels were close and friendly, as he wrote to Shutts to see Polk and find out why he "talked so crazy" at the meetings.

Dawson Brande went on the board in 1933 or 1934. He was a partner in B. J. Carney & Company of Minneapolis, who were processors and sellers of poles for telephone, telegraph and electric transmission lines. He knew the Bechtels, as ISU was a good customer of his company. Commencing in 1930 or 1931 he sold for his company to ISU up to 1939, inclusive, poles for a total amount of $206,458.96. He also spoke of good sales to the Moose Jaw, Canada, affiliate of ISU. Prior to 1930 he acquired preferred stock of ISU. Two hundred shares of this he received from his father who had taken it from Geo. M. Bechtel & Co. when it acquired the Peoples Light & Fuel Company at Grinnell. With the exception of the Bechtels he was the largest holder of ISU preferred stock among the directors. He was an experienced business man. When finances became critical with ISU, earnings decreased, dividends stopped, and dividends in arrears piled up, and the preferred stock and the bonds of ISU dropped on the market, he interested himself in improving the situation. There was no difference of opinion among all of the directors, including the Bechtels, that there should be a recapitalization. The only controversy was what should be the participation as between the common and preferred stock in the reclassification. That was the only difference between Brande and the Bechtels. Each was seek-

ing for the best of the bargain, vigorously but amicably. Bechtels placed a high valuation on the common stock, but Brande knew that it had no value and was entitled to nothing or but little in any reclassification. He so expressed himself a number of times, but in the end he joined with all the other directors in giving to the Bechtels 39,468 shares of new common stock for their worthless old common stock, notwithstanding, as Mr. Shutts testified, that in so doing the common stock in the reclassification received the same treatment as the preferred stock, except the latter received the benefits of the dividends accrued and unpaid. We think the record sustains the second contention of plaintiffs, which adds unnecessary support to our conclusion on the first contention.

V. Defendants argue that the fraud on which this action is based does not make it one solely cognizable in Courts of Chancery before the adoption of the Code. The trial court did not discuss this question, but held as a matter of fact that the Bechtel letter of January 30, 1937 constituted a discovery of the fraud by the plaintiffs and that the statute of limitations had run against all claims sued upon.

As we have stated herein a fiduciary relation existed between ISU and the defendants who were its officers or directors. As such they were representing the Company as agents and trustees, or as this court at times has said as quasi trustees. The fraud was perpetrated not only by fraudulent concealment, by silence and by violation of their duty to make full disclosure to the corporation, but by active fraud. In either case, the statute of limitations was tolled until the fraud was discovered, or by use of reasonable diligence might have been discovered. This is not a case where a misrepresentation or false statement was openly made to effect the fraud. Here Geo. M. Bechtel & Co. had complete control and management of ISU. It was in reality *the* corporation. It actively perpetrated the fraud by dominating and corrupting the other directors to violate their duty and fiduciary relationship to the corporation. By its domination and concert of action it caused the corporation to issue to Bechtel & Co. its securities greatly in excess of the acquisition cost of the properties delivered to ISU. It concealed these facts from the corporation to accomplish the fraudulent appropriation of its

property. It was under a legal duty, as were its individual members and associates as directors and officers of ISU, to fully and fairly disclose all facts concerning the transactions. There was fraud by silence and concealment and by active misconduct. These principles have been recognized and made effective aside from statutory provisions. Vertman v. Drayton, 223 Iowa 380, 383, 272 N.W. 438; Wilder v. Secor, 72 Iowa 161, 162, 163, 33 N.W. 448, 2 Am. St. Rep. 236; Faust v. Hosford, 119 Iowa 97, 100, 93 N.W. 58; The District Township of Boomer v. French, 40 Iowa 601, 603; Findley v. Stewart, 46 Iowa 655, 657; Pullan v. Struthers, 201 Iowa 1179, 1181, 207 N.W. 235; Cole v. Charles City Nat. Bk., 114 Iowa 632, 635, 87 N.W. 671; Caffee v. Berkley, supra, 141 Iowa 344, 118 N.W. 267, and other authorities hereinbefore cited.

The fraud was conceived in the organization of ISU and the inclusion in the Certificate of Incorporation of provisions to aid in the carrying out of the fraud, and by resolutions thereafter passed and a policy adopted of preventing stockholders from an examination of the books and records, so as to effectively conceal the fraud.

VI. The losses which we found were sustained by the Company in Divisions 11, 12, 13, 14 and 15 involving the Bechtel Note, Management Fees, Common Stock Dividends, Stock Commissions and Bond Commissions were all matters appearing in the resolutions in the corporate records or in the books of account. As to the Management Fees there was no action with respect to them in the corporate records, and they were somewhat disguised in the books of account. But with all these items there was sufficient evidence of their nature of record that by the use of reasonable vigilance they should have been discovered by some of the officers or directors.

It is our conclusion that recovery upon them is barred by statute of limitations and laches.

VII. The defendants have failed to establish laches or estoppel as a defense to the ten items of loss sustained and passed upon in the first ten Divisions of this opinion, and numbered 1 to 10, both inclusive, in the recapitulation statement herein set out.

VIII. The defendants did not establish that recovery

of judgment against defendant Edward L. Shutts was barred by statute of limitations, or by laches or estoppel on the part of defendant Iowa Southern Utilities Company, or of the plaintiffs representing them. Edward L. Shutts during all of the time that the secret or private pay roll account was in existence and being carried on as herein stated was assistant secretary and auditor of the Company, until he became president, treasurer and director on June 8, 1937, which offices he held thereafter through 1944 and succeeding years. As assistant secretary and auditor he owed a duty to perform the duties of those offices honestly and faithfully to the best interest of the Company. From June 8, 1937 he held the highest offices in the Company. They were offices in the nature of trusts in which a fiduciary relation existed between him and the Company, and its stockholders. During the time that said account existed, wrongfully and fraudulently and in violation of his official duties, trust and fiduciary relation, each month without interruption during that period he withdrew large sums of money from the Company and deposited them in said account, and each month in the same wrongful and fraudulent manner he withdrew large sums of money from said account and wrongfully and fraudulently appropriated it to the use of himself and others. All of this was done secretly and without disclosure to or consent of the Company. This was done continuously and without any hiatus or interruption, and by so doing a continuous account was established between him and the Company. He fraudulently concealed his wrongful acts by maintaining said account as a private one and not a Company one and by concealing the canceled checks, and by so maintaining the books of account of the Company as to effectually prevent its discovery of his fraudulent appropriation of this fund, which continued after this action was begun and into January 1944, and until after said time. Soderland v. Graeber, 190 Iowa 765, 776, 180 N.W. 745, and cases cited. The contention of the defendants that this claim was barred by the statute of limitations and laches was not established.

IX. The trial court erred, probably inadvertently, in its Conclusions of Law (paragraph 29) that in the recapitalization "all of the shares of new common stock, into which the former shares of preferred stock and common stock were transmuted,

simultaneously with the adoption of the amendment to the certificate of incorporation, constitute valid stock of the corporation." This is contrary to the decree in State ex rel. Weede v. Bechtel, 239 Iowa 1298, 31 N.W.2d 853, 8 A. L. R.2d 1162, which affirmed the lower court in holding that the 39,468 shares of new common stock issued for the old common stock of the Company were invalid and void. It was the new common stock which was issued for the old preferred stock which was held valid in State ex rel. Weede v. Bechtel, supra.

X. The defendant DeElda Lee, executrix of the estate of J. Ross Lee, has failed to establish the defenses of the statute of limitations and laches, and the said estate and executrix thereof are liable to Iowa Southern Utilities Company of Delaware on the claims discussed in the first ten Divisions of the opinion in the amount of $2,211,649.68 with interest as provided by law.

It is the conclusion and opinion of this court that:

1. The Iowa Southern Utilities Company of Delaware have judgment and decree rendered and entered in the District Court of Appanoose County, Iowa, in the amount of $2,211,549.68 with legal interest, in its favor and against George M. Bechtel, Harold R. Bechtel, and the estate of J. Ross Lee and DeElda Lee as executrix of said estate.

2. The Iowa Southern Utilities Company of Delaware have judgment rendered and entered in the District Court of Appanoose County, Iowa, in its favor and against the defendant Edward L. Shutts in the amount of $46,728.29 with interest as provided by law.

3. Plaintiffs' petition for appointment of a receiver for the Iowa Southern Utilities Company of Delaware is denied.

4. Any recovery against the present officers of the Iowa Southern Utilities Company except Edward L. Shutts is denied and the action against them is dismissed.

5. The defense of George M. Bechtel and Harold R. Bechtel of their discharge in bankruptcy against any judgment entered as above noted is held to have not been established.

The judgment and decree of the district court is reversed and remanded for entry of judgment and decree in the District

Court of Appanoose County, Iowa, in conformity herewith.—
Reversed and remanded.

All JUSTICES concur except JUSTICE SMITH, not sitting.